UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

**FIREFIGHTERS' RETIREMENT
SYSTEM, ET AL.**

                                                    **CIVIL ACTION**

**VERSUS**

                                                    **13-373-SDD-EWD**

**CITCO GROUP LIMITED, ET AL.**

<u>**RULING AND ORDER ON MOTION TO COMPEL**</u>

Before the court is a Motion to Compel[1] filed by plaintiffs, Firefighters' Retirement System ("FRS"), Municipal Employees' Retirement System of Louisiana ("MERS"), and New Orleans Firefighters' Pension & Relief Fund ("NOFF") (collectively, "Plaintiffs"). Defendants, Citco Technology Management, Inc. ("CTM"), Citco Banking Corporation N.V. ("Citco Banking"), Citco Fund Services (Cayman Islands) Limited ("CFS Cayman"), and The Citco Group Limited ("Citco Group") (collectively, the "Citco Defendants") have filed an Opposition.[2] The parties discussed the Motion to Compel during the July 25, 2017 in court status conference. This Ruling and Order is intended to memorialize the oral rulings made during the status conference. For the reasons set forth during the July 25, 2017 conference, as well as those set forth herein, Plaintiffs' Motion to Compel is **GRANTED IN PART AND DENIED IN PART**.

## I.    Background

On March 1, 2013, Plaintiffs filed suit against 23 defendants, including the Citco Defendants, asserting claims under the Louisiana Securities Act and Louisiana Unfair Trade Practices Act, as well as third party beneficiary, unjust enrichment, breach of contract, negligent misrepresentation, and general tort claims.[3] Plaintiffs' claims arise from a $100 million investment

---

[1] R. Doc. 412.

[2] R. Doc. 417.

[3] R. Doc. 1-3.

loss.  In April of 2008, the Louisiana Funds purchased 100,000 Series N Shares offered and issued by FIA Leveraged Fund ("Leveraged") for $100 million.[4]  After a series of investment transactions initiated by Leveraged, in March of 2011, Plaintiffs sought to redeem their Series N shares.[5]  Ultimately, the shares went unredeemed and the Plaintiffs determined that the investment was illiquid and, thus, the N shares, for which there was no market, were valueless.[6]

On September 30, 2016, the District Judge ruled on various motions to dismiss.  Following those rulings, the following claims remain against CFS Cayman: (1) seller liability under La. R.S. 51:712(A)(2) based on Plaintiffs' allegation that CFS Cayman was a "substantial factor" in the sale of the Series N shares;[7] (2) control person liability based on Plaintiffs' allegation that CFS Cayman was designated in the offering documents to provide information to prospective investors about the offering;[8] (3) a third party beneficiary claim;[9] (4) negligent misrepresentation based on Plaintiffs' allegation that CFS Cayman was the designated Administrator of Leveraged and that, as such, CFS Cayman would perform various functions including "computing the NET Asset

---

[4] R. Doc. 1-3, ¶ 34.

[5] R. Doc. 1-3, ¶ 41.

[6] R. Doc. 1-3, ¶¶ 34-45 & 18.

[7] R. Doc. 327, pp. 5-11.  La. R.S. § 51:712(A)(2) provides that it is unlawful for any person

> To offer to sell or to sell a security by means of any oral or written untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, if such person in the exercise of reasonable care could not have known of the untruth or omission.

[8] R. Doc. 327, p. 7.

[9] R. Doc. 327, p. 9.  Plaintiffs contend they were third party beneficiaries of the administrative services agreement between CFS Cayman and Leveraged and that CFS Cayman failed to properly calculate the net asset value of Plaintiffs' investment and failed to inform Plaintiffs of material information at the time of the Series N offering and during the time of Plaintiffs' investment.

Value of the Fund's Shares;"[10] and (5) a holder claim.[11]  As to CTM, Citco Banking, and Citco Group, the following claims remain: (1) seller liability based on allegations that defendants are liable as sellers due to their extensive relationship with operations of Leveraged;[12] (2) control person liability based on allegations that Citco Defendants delivered the offering memorandum to Plaintiffs in Louisiana, that the offering documents represented the terms negotiated by the Citco Defendants, and that the Citco Defendants played a critical role in providing information necessary for Plaintiffs to make the investment;[13] (3) negligent misrepresentation based on allegations that Plaintiffs based their investment on Citco Defendants' representations;[14] and (4) a holder claim[15]

Relevant to the instant Motion to Compel, Plaintiffs assert that Citco and Fletcher structured a May 26, 2006 transaction wherein the Royal Bank of Scotland ("RBS") loaned Global Hawk $91,250,000 to purchase Corsair Notes, and that Series 4, 5, and 6 shares of Leveraged were pledged to secure the Corsair Notes.[16]  Plaintiffs further assert that "[w]hile Citco was closing the

---

[10] R. Doc. 327, p. 10.

[11] R. Doc. 327, p. 10.

[12] R. Doc. 325, p. 29.

[13] R. Doc. 325, p. 31. La. R.S. § 51:714(B) provides:

> Every person who directly or indirectly controls a person liable under Subsection A of this Section, every general partner, executive officer, or director of such person liable under Subsection A of this Section, every person occupying a similar status or performing similar functions, and every dealer or salesman who participates in any material way in the sale is liable jointly and severally with and to the same extent as the person liable under Subsection A of this Section unless the person whose liability arises under this Subsection sustains the burden of proof that he did not know and in the exercise of reasonable care could not have known of the existence of the facts by reason of which liability is alleged to exist. There is contribution as in the case of contract among several persons so liable.

Subsection A provides for civil liability for any person who violates La. R.S. § 51:712(A).  "Control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  La. R.S. § 51:702(4).

[14] R. Doc. 325, p. 34.

[15] R. Doc. 325, p. 35.

[16] R. Doc. 412-2, p. 4.

Richcourt transaction in 2006, its internal audit team apparently identified numerous high risk factors associated with the Fletcher funds being serviced by CFS Cayman."[17]   Specifically, Plaintiffs assert that an audit dated July 15, 2007 notes a "final report of Fletcher had been issued in January, 2007" reflecting that the securities were valued based on aggressive assumptions and that the private placement memoranda did not adequately describe the risks.[18]

Plaintiffs assert that the Richcourt Funds guaranteed RBS's loan to Global Hawk[19] and that Global Hawk used the proceeds from this loan to purchase the Corsair Notes from a Citco affiliate, Amathea.[20]  On June 24, 2009, RBS "declared a default…based on its failure to receive from Citco certain financial information about the Richcourt Funds required by the RBS-Richcourt CDS,"[21] and notified Global Hawk and Citco that it desired to terminate the lending relationship and that "[t]here was a shortfall in the RBS collateral which required the payment of proceeds of approximately $9.1 million for the sale of the Series 4, 5, and 6 shares."[22]

Plaintiffs argue that they purchased Series N shares on April 1, 2008 based on "the express representations that [the Series N shares] ranked senior in payment of dividends and repayment to the Series 4, 5, and 6 shares held by Corsair."[23]  Plaintiff contend that at the time they closed on the Series N shares, Citco owned Richcourt funds.[24]  Plaintiffs further assert that Citco secured written consents from the owners of the Series 4, 5, and 6 shares to allow issuance of the preferred

---

[17] R. Doc. 412-2, p. 7.

[18] R. Doc. 412-2, p. 8.

[19] R. Doc. 412-2, p. 5.

[20] R. Doc. 412-2, p. 4.

[21] R. Doc. 412-2, p. 5.

[22] R. Doc. 412-2, p. 5.

[23] R. Doc. 412-2, p. 3.  Plaintiffs argue that Leveraged had a $20 million outstanding loan to Citco Bank that was in default and that the loan was repaid using offering proceeds secured from the Louisiana Funds' purchase of the Series N shares.  R. Doc. 412-2, p. 4.

[24] R. Doc. 412-2, p. 5.

shares to the Louisiana Funds prior to the Louisiana Funds' closing and then conspired with Fletcher "in March and April 2010 to circumvent the terms of the offering…and force Fletcher to redeem the Series 4, 5, and 6 shares" on August 23, 2010 (*i.e.*, without first redeeming Plaintiffs' preferred Series N shares).[25]  Plaintiffs argue that both Citco and Fletcher then "attempted to cover their tracks" and that "Citco Trust,[26] as sole director of Global Hawk, consented to the transaction as of September 10, 2010."[27]  Plaintiffs assert that "Citco knowingly transferred the proceeds to RBS, payment to Richcourt, fees to Fletcher and fees to Citco in derogation to the superior rights of the Louisiana Funds, as holders of the preferred Series N Shares even though it secured the approval of these same individuals to allow the issuance of the Series N shares in March of 2008."[28]

Plaintiffs seek to compel documents responsive to particular Requests for Production based on different date ranges.  Plaintiffs' Motion to Compel is presented based on three "groups" of documents: (1) Group One with a date range of January 1, 2007 through September 1, 2010; (2) Group Two with a date range of January 1, 2006 or May 1, 2006 through September 1, 2010; and (3) Group Three with a date range of October 1, 2007 through March 31, 2011.  The Citco Defendants have previously produced documents within the date range of October 1, 2007 through June 30, 2010.

---

[25] R. Doc. 412-2, p. 3.  *See also*, R. Doc. 412-2, p. 5 ("By resolution dated April 1, 2010, Leveraged voted to redeem the Series 4, 5, and 6 shares to fund the RBS loan deficiency.").

[26] Citco Trust is not a party to these proceedings.

[27] R. Doc. 412-2, p. 4.  *See also*, R. Doc. 412-2, pp. 5-6 ("Citco insisted that the remaining $9.1 million come out of Leveraged to repay RBS.  The $9.1 million was obtained from Leveraged by the Richcourt Funds' redeeming the Series 4, 5, and 6 shares.  This amount was finally paid on August 23, 2010 after months of negotiation between Citco and Fletcher.  Ermanno Unternaehrer executed the August 23, 2010 settlement, which was the date the Funds were finally paid.  Citco Trust ("CTC Corporation") was also the sole director of Global Hawk and responsible for the closing of the transaction and paying the money to RBS.  As the sole director of Global Hawk, Citco continued to be involved in the Global Hawk wind down when it approved the transfer of the Series 4, 5, and 6 shares in exchange for shares in Arbitrage on September 8, 2010.").

[28] Motion to Compel (13-373), R. Doc. 412-2, p. 7.

In opposition to the Motion to Compel, Citco asserts that the expanded date range proposed by Plaintiffs encompasses documents that are in no way relevant to Plaintiffs' claims or proportional to the needs of the case.[29]  Specifically, the Citco Defendants assert that "the viability of Plaintiffs' claims rests on what Citco told or did not tell Plaintiffs either (i) at the time they invested in Leveraged in April 2008 or (ii) while Plaintiffs were invested in Leveraged up until the time Citco resigned as Leveraged's administrator in March 2010.[30]  To say it another way, documents generated either (i) long before Plaintiffs invested or (ii) after Citco's involvement with Leveraged had ended cannot possibly be relevant to the actual claims Plaintiffs have asserted or the elements necessary to prove them."[31]

## II.    Law and Analysis

### a.  Legal Standards

"Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.  Information within this scope of discovery need not be admissible in evidence to be discoverable."  Fed. R. Civ. P. 26(b)(1).

A determination of relevancy is tied to applicable substantive law and then weighed against the six proportionality factors.  Any information sought that is not relevant to a party's claim or

---

[29] R. Doc. 417, p. 2.

[30] At the July 25, 2017 conference, Citco's counsel acknowledged that Citco continued to perform some "transitional functions" with Leveraged until June 15, 2010.

[31] R. Doc. 417, p. 3.

defense is not discoverable, regardless of proportionality. The court must additionally limit the frequency or extent of discovery if it determines that: "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C).

### b. Group One Documents

The "Group One" requests generally seek documents related to the financial condition and/or valuation of Leveraged, terms for the Series N shares, redemption rights (for both Series N and non-Series N shares), and agreements/communications between Citco and various entities/individuals (Fletcher, Corsair, Global Hawk, Leveraged, Arbitrage, FILB, Richcourt, Joe Meals, CSG). During the July 25, 2017 status conference, counsel for Plaintiffs confirmed that documents in Group One generally relate to the financial health of Leveraged.

### i. January 1, 2007 Start Date

Plaintiffs argue that Citco should produce documents responsive to certain Requests for Production falling within Group One starting with those dated January 1, 2007 because "Citco's knowledge of the financial condition of Leveraged and the duty it had not to omit the disclosure of relevant information is highly relevant to the liability of Citco based upon the role Citco played as administrator, securing the consents of the Series 4, 5, and 6 shares, as well as being the recipient of $50 million of the proceeds from the offering."[32] In response, the Citco Defendants argue that the supposed omissions and misrepresentations supporting Plaintiffs' securities act claims are those which were made "at the time of the offering;" therefore, "the only relevant time period for

---

[32] R. Doc. 412-2, p. 12.

determining whether Citco violated Section 712 is at the time the Series N Shares were devised and structured, and then sold to Plaintiffs."[33]  With respect to the third party beneficiary claim, Citco argues that "[n]o information before 2008 could conceivably be relevant to this claim because Plaintiffs were not, and necessarily could not have been, third-party beneficiaries of that agreement *before* they invested in Leveraged in April 2008 or after CFS Cayman resigned as Leveraged administrator in March 2010."[34]  With respect to Plaintiffs' negligent misrepresentation claim, the Citco Defendants argue that Plaintiffs must prove a legal duty on the part of Citco to provide correct information, and that because the existence of a sufficiently close relationship such as that of fiduciary or created by contract "is a necessary element of a negligent misrepresentation claim, documents generated many months or even years before Plaintiffs invested in Leveraged cannot possibly be relevant because Plaintiffs were not in a fiduciary or contractual relationship with Citco before they invested."[35]  Finally, with respect to Plaintiffs' holder claim, Citco argues that such a claim "necessarily rests on alleged omissions that could have been made only after Plaintiffs invested in Leveraged."[36]

During the July 25, 2017 status conference, counsel for the Citco Defendants argued that the Plaintiffs' investment was made in April 2008 and that Citco produced documents six months prior to that date.  Counsel for the Citco Defendants argued that this six month timeframe provided Plaintiffs with a good understanding of what Citco knew at the time of Plaintiffs' investment and that requiring production of additional documents would result in "an avalanche of responsive

---

[33] R. Doc. 417, pp. 4-5.

[34] R. Doc. 417, p. 5.  *See also*, R. Doc. 1-3, ¶ 154 ("The Citco Defendants breached their respective duties to the Plaintiffs, as a third party beneficiary of the Administration Contract, at the time of the offering to Plaintiffs and at all times between the date of the offering in March of 2008 until the resignation of the Citco Defendants as Administrator….").

[35] R. Doc. 417, p. 6.

[36] R. Doc. 417, p. 7.

documents" not proportional to the needs of the case. [37]    In support of compelling an earlier time frame, Plaintiffs' counsel asserted that there was no legal basis for limiting the time period of Citco's knowledge.

The undersigned agrees that a time frame of six months prior to Plaintiffs' investment is somewhat arbitrary, and that there may be relevant documents within the date range of January 1, 2007 through October 1, 2007. In particular, Plaintiffs' assertion that a July 15, 2007 audit notes a "final report of Fletcher had been issued in January, 2007" reflecting that the securities were valued based on aggressive assumptions and that the private placement memoranda did not adequately describe the risks[38] supports Plaintiffs' position that relevant documents may exist within this earlier date range. However, Citco's arguments regarding the proportionality of such an expanded date range are also persuasive. During the July 25, 2017 conference, counsel for the Citco Defendants asserted that uniformly expanding the date range for Group One documents to include January 1, 2007 through October 1, 2007 for all custodians and all search terms could result in months of additional work. In light of these proportionality concerns, the undersigned GRANTED IN PART Plaintiffs' Motion to Compel production of Group One documents for the date range of January 1, 2007 through October 1, 2007. Specifically, the Citco Defendants are ORDERED to produce the July 15, 2007 audit and any documents related to the July 15, 2007 audit. Following Plaintiffs' review of this limited set of Group One documents, Plaintiffs may seek additional Group One documents within the date range of January 1, 2007 through October 1, 2007 upon a detailed showing of the specific necessity for additional discovery on this issue.

---

[37] Citco asserts that "all that matters is what Citco knew – and allegedly failed to disclose – at the time of the investment." R. Doc. 417, p. 8.

[38] R. Doc. 412-2, p. 8.

### ii.  September 1, 2010 End Date

Plaintiffs further argue that production of other documents responsive to certain Requests for Production falling within Group One should be produced through an end date of September 1, 2010 based on their assertion that the Citco Defendants remained involved in the disbursement of the redemption of the Series 4, 5, and 6 shares.  During the July 25, 2017 conference, counsel for the Citco Defendants explained that CFS Cayman resigned as administrator in March 2010 but continued to provide "transitional" services through June 15, 2010.  Counsel for Citco further explained that none of the Citco Defendants named in this case were involved in the unwinding of Global Hawk and Corsair.[39]  Counsel for Plaintiffs argued that when Plaintiffs' purchased the Series N shares, they understood that such shares ranked senior to the Series 4, 5, and 6 shares, and that emails produced indicate that the same individuals with Citco who were involved in obtaining approval for Plaintiffs' purchase of senior ranking shares were also involved in the redemption of non-Series N shares.

Although the fact of the redemption of the non-Series N shares could be relevant to Plaintiffs' claims, based on the information presented, Plaintiffs have not established that additional information should be compelled particularly where no showing was made that any of the Citco Defendants were actually involved in the redemption of the Series 4, 5, and 6 shares or the unwinding of Corsair or Global Hawk.  Accordingly, Plaintiffs' Motion to Compel production of Group One documents with the date range of June 16, 2010 through September 1, 2010 is DENIED.

---

[39] Citco asserts that the only Citco entities involved in the Corsair/Global Hawk transaction "were CTC Corporation Ltd., Citco Trustees (Cayman) Ltd., and CFS Amsterdam, none of which is a party to this action" and that "none of the Citco entities that are before this Court had anything to do with the unwinding."  R. Doc. 417, p. 9.

### c.  Group Two Documents

Plaintiffs contend that "Group Two Documents are a narrow group of transaction documents."[40]  First, Plaintiffs seek to compel production of Global Hawk closing documents and fee sharing agreements executed between Citco and Fletcher for the time frame of May 1, 2006 through September 1, 2010.  Second, Plaintiffs seek to compel production of documents related to the initial funding of "the Citco Bank Loan to Leveraged and the relationship that it had to Global Hawk."[41]  Plaintiffs assert that they seek the initial loan closing documents and they "desire to know whether the loan was made in consideration of the payment of 50% of the Fletcher Fees earned from the Corsair Transaction.  After the loan was funded, Plaintiffs desire to know Citco's evaluation of the collateral and when it determined that the collectability of the loan was in question.  All this likely occurred between January 1, 2006 and the date of the repayment of the loan."[42]

During the July 25, 2017 conference, Plaintiffs' counsel explained that Plaintiffs seek to compel Group Two documents in order to examine the relationship between Fletcher and Citco.  Counsel for the Citco Defendants asserted that Citco loan documents had previously been produced, as well as the fee sharing agreement at issue.[43]  Plaintiffs' counsel argued that while Plaintiffs did have the fee agreement, they did not have any documents explaining why that agreement was entered into, and that the Group Two documents may be relevant to showing Citco's motive and willful conduct.  Citco's counsel asserted that Citco's motive would not be

---

[40] R. Doc. 412-2, p. 16.

[41] R. Doc. 412-2, p. 18.

[42] R. Doc. 412-2, p. p. 18-19.

[43] *See also*, R. Doc. 417, p. 9 ("Citco has – even though the Corsair/Global Hawk transaction is irrelevant to Plaintiffs' claims – already produced documents from October 2007 through June 2010 relating to the transaction, including the notice of compulsory redemption of the Series 4, 5, and 6 shares in March 2010.  Plaintiffs thus have more documents on this issue that they are entitled to in light of their claims.").

relevant to a Louisiana Securities Act claim. Based on the briefing as well as the arguments of counsel, Plaintiffs have not established the relevance of the additional Group Two documents they now seek to compel. Accordingly, Plaintiffs' Motion to Compel production of additional Group Two documents is DENIED.

### d. Group Three Documents

This group of documents purportedly relates "to any documents in Citco's possession that relate to the resignation of Grant Thornton as auditor or the restatement of the financial statements for the years ending December 31, 2007 and December 31, 2008 and the Restated Financial Statements issued on January 22, 2011."[44] For this group of documents, Plaintiffs have no objection to a commencement date of October 1, 2007 but contend that the end date for such production should span through March 31, 2011. Grant Thornton resigned on March 25, 2010, and issued restated audits on January 20, 2011. Plaintiffs contend that even though Citco had "resigned from being administrator as of the date of the restatement, the subject of the restatement related to the functions performed by Citco during this time period and any communications with Citco by Grant Thornton or Citco's view of the accounting errors on statements that it generated are highly relevant."[45]

Citco does not specifically address the timeframe for production of Grant Thornton related documents in opposition to the Motion to Compel; however, as set forth above, Citco asserts that it had no involvement or duties to Plaintiffs after March, 2010 when it resigned as administrator of Leveraged. During the July 25, 2017 conference, counsel for the Citco Defendants suggested that the parties work together to determine a limited number of custodians with respect to which

---

[44] R. Doc. 412-2, p. 19.

[45] R. Doc. 412-2, p. 19.

the term "Grant Thornton" would be searched. The undersigned noted that although Plaintiffs'

Motion to Compel sought to extend the date range for such documents through March 31, 2011, it

appeared that the date range should only extend through January 20, 2011 based on the date the

restated audits were issued. Counsel for Plaintiffs agreed that counsel could confer to attempt to

reach an agreement on this issue. Based on the parties' agreement, Plaintiffs' Motion to Compel

Group Three documents is DENIED AS MOOT.

## IV.     Conclusion

For the reasons set forth herein, as well as those discussed during the July 25, 2017 status

conference, the Motion to Compel[46] filed by plaintiffs, Firefighters' Retirement System ("FRS"),

Municipal Employees' Retirement System of Louisiana ("MERS"), and New Orleans Firefighters'

Pension & Relief Fund ("NOFF") (collectively, "Plaintiffs") is **GRANTED IN PART AND**

**DENIED IN PART**.

Plaintiffs' Motion to Compel production of Group One documents for the date range of

January 1, 2007 through October 1, 2007 is **GRANTED IN PART**. Defendants, Citco

Technology Management, Inc. ("CTM"), Citco Banking Corporation N.V. ("Citco Banking"),

Citco Fund Services (Cayman Islands) Limited ("CFS Cayman"), and The Citco Group Limited

("Citco Group") (collectively, the "Citco Defendants") are **ORDERED** to produce the July 15,

2007 audit and any documents related to the July 15, 2007 audit. Following Plaintiffs' review of

this limited set of Group One documents, Plaintiffs may seek additional Group One documents

within the date range of January 1, 2007 through October 1, 2007 upon a detailed showing of the

specific necessity for additional discovery on this issue.

---

[46] R. Doc. 412.

Plaintiffs' Motion to Compel production of Group One documents with the date range of June 16, 2010 through September 1, 2010 is **DENIED**.

Plaintiffs' Motion to Compel production of additional Group Two documents is **DENIED**.

Plaintiffs' Motion to Compel Group Three documents is **DENIED AS MOOT**.

Signed in Baton Rouge, Louisiana, on July 26, 2017.


**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**