**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

**FIREFIGHTERS' RETIREMENT SYSTEM, ET AL.**

**VERSUS**

**CITCO GROUP LIMITED, ET AL.**

**CIVIL ACTION**

**13-373-SDD-EWD**

**RULING AND ORDER ON MOTION FOR NEW TRIAL AND/OR REHEARING OF MOTION TO COMPEL (DOC. 426)**

Before the court is a Motion for New Trial and/or Rehearing of Motion to Compel (Doc. 426) (the "Motion for Reconsideration")[1] filed by plaintiffs, Firefighters' Retirement System ("FRS"), Municipal Employees' Retirement System of Louisiana ("MERS"), and New Orleans Firefighters' Pension & Relief Fund ("NOFF") (collectively, "Plaintiffs"). Defendants, Citco Technology Management, Inc. ("CTM"), Citco Banking Corporation N.V. ("Citco Banking"), Citco Fund Services (Cayman Islands) Limited ("CFS Cayman"), and The Citco Group Limited ("Citco Group") (collectively, the "Citco Defendants") have filed an Opposition.[2] For the reasons set forth herein, Plaintiffs' Motion for Reconsideration[3] is **GRANTED**.[4]

**IT IS HEREBY ORDERED** that the Citco Defendants shall produce "Group One" documents for the date range of June 16, 2010 through September 1, 2010 within thirty (30) days of this Ruling and Order.

---

[1] R. Doc. 429.

[2] R. Doc. 440.

[3] R. Doc. 429.

[4] On October 13, 2017, the Motion for Reconsideration was referred to the undersigned.

1

I.   **Background**

On March 1, 2013, Plaintiffs filed suit against 23 defendants, including the Citco Defendants, asserting claims under the Louisiana Securities Act and Louisiana Unfair Trade Practices Act, as well as third party beneficiary, unjust enrichment, breach of contract, negligent misrepresentation, and general tort claims.[5] Plaintiffs' claims arise from a $100 million investment loss. In April of 2008, the Louisiana Funds purchased 100,000 Series N Shares (also referred to as "Non Series 4, 5, and 6 Shares") offered and issued by FIA Leveraged Fund ("Leveraged") for $100 million.[6] Plaintiffs sought to redeem their Series N shares in March of 2011 after a series of investment transactions initiated by Leveraged.[7] Ultimately, the shares went unredeemed and the Plaintiffs determined that the investment was illiquid and, thus, the Series N shares, for which there was no market, were valueless.[8]

On September 30, 2016, the District Judge ruled on various motions to dismiss. The following claims remain against CFS Cayman: (1) seller liability under La. R.S. 51:712(A)(2) based on Plaintiffs' allegation that CFS Cayman was a "substantial factor" in the sale of the Series N shares;[9] (2) control person liability based on Plaintiffs' allegation that CFS Cayman was designated in the offering documents to provide information to prospective investors about the

---

[5] R. Doc. 1-3.

[6] R. Doc. 1-3, ¶ 34.

[7] R. Doc. 1-3, ¶ 41.

[8] R. Doc. 1-3, ¶¶ 34-45 & 18. Leveraged was a feeder fund which Plaintiffs allege was formed primarily to invest in a master fund, Fletcher Income Arbitrage, Ltd. R. Doc. 1-3, ¶ 10.

[9] R. Doc. 327, pp. 5-11. La. R.S. § 51:712(A)(2) provides that it is unlawful for any person
> To offer to sell or to sell a security by means of any oral or written untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, if such person in the exercise of reasonable care could not have known of the untruth or omission.

2

offering;[10] (3) a third party beneficiary claim;[11] (4) negligent misrepresentation based on Plaintiffs' allegation that CFS Cayman was the designated Administrator of Leveraged and that, as such, CFS Cayman would perform various functions including "computing the NET Asset Value ["NAV"] of the Fund's Shares;"[12] and (5) a holder claim.[13] As to CTM, Citco Banking, and Citco Group, the following claims remain: (1) seller liability based on allegations that defendants are liable as sellers due to their extensive relationship with operations of Leveraged;[14] (2) control person liability based on allegations that Citco Defendants delivered the offering memorandum to Plaintiffs in Louisiana, that the offering documents represented the terms negotiated by the Citco Defendants, and that the Citco Defendants played a critical role in providing information necessary for Plaintiffs to make the investment;[15] (3) negligent misrepresentation based on allegations that

---

[10] R. Doc. 327, p. 7.

[11] R. Doc. 327, p. 9. Plaintiffs contend they were third party beneficiaries of the administrative services agreement between CFS Cayman and Leveraged and that CFS Cayman failed to properly calculate the net asset value of Plaintiffs' investment and failed to inform Plaintiffs of material information at the time of the Series N offering and during the time of Plaintiffs' investment.

[12] R. Doc. 327, p. 10.

[13] R. Doc. 327, p. 10.

[14] R. Doc. 325, p. 29.

[15] R. Doc. 325, p. 31. La. R.S. § 51:714(B) provides:

> Every person who directly or indirectly controls a person liable under Subsection A of this Section, every general partner, executive officer, or director of such person liable under Subsection A of this Section, every person occupying a similar status or performing similar functions, and every dealer or salesman who participates in any material way in the sale is liable jointly and severally with and to the same extent as the person liable under Subsection A of this Section unless the person whose liability arises under this Subsection sustains the burden of proof that he did not know and in the exercise of reasonable care could not have known of the existence of the facts by reason of which liability is alleged to exist. There is contribution as in the case of contract among several persons so liable.

Subsection A provides for civil liability for any person who violates La. R.S. § 51:712(A). "Control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." La. R.S. § 51:702(4).

Plaintiffs based their investment on the Citco Defendants' representations;[16] and (4) a holder claim[17]

On July 11, 2017, Plaintiffs filed a Motion to Compel the Production of Documents from The Citco Group Limited, Citco Technology Management, Inc., Citco Banking Corporation, N.V., and Citco Fund Services (Cayman islands) Limited (the "Motion to Compel").[18] Per the Motion to Compel, Plaintiffs asserted that Citco and Fletcher structured a May 26, 2006 transaction wherein the Royal Bank of Scotland ("RBS") loaned Global Hawk $91,250,000 to purchase Corsair Notes, and that Series 4, 5, and 6 shares of Leveraged were pledged to secure the Corsair Notes.[19] Plaintiffs assert that Richcourt Funds guaranteed RBS's loan to Global Hawk[20] and that Global Hawk used the proceeds from this loan to purchase the Corsair Notes from a Citco affiliate, Amathea.[21] On June 24, 2009, RBS "declared a default…based on its failure to receive from Citco certain financial information about the Richcourt Funds required by the RBS-Richcourt CDS,"[22] and notified Global Hawk and Citco that it desired to terminate the lending relationship and that "[t]here was a shortfall in the RBS collateral which required the payment of proceeds of approximately $9.1 million for the sale of the Series 4, 5, and 6 shares."[23]

Plaintiffs argue that they purchased Series N shares on April 1, 2008 based on "the express representations that [the Series N shares] ranked senior in payment of dividends and repayment to

---

[16] R. Doc. 325, p. 34.
[17] R. Doc. 325, p. 35.
[18] R. Doc. 412.
[19] R. Doc. 412-2, p. 4.
[20] R. Doc. 412-2, p. 5.
[21] R. Doc. 412-2, p. 4.
[22] R. Doc. 412-2, p. 5.
[23] R. Doc. 412-2, p. 5.

the Series 4, 5, and 6 shares held by Corsair."[24]  Plaintiffs contend that at the time they closed on the Series N shares, Citco owned Richcourt funds.[25]  Plaintiffs further assert that Citco secured written consents from the owners of the Series 4, 5, and 6 shares to allow issuance of the preferred shares to the Louisiana Funds prior to the Louisiana Funds' closing and then conspired with Fletcher "in March and April 2010 to circumvent the terms of the offering…and force Fletcher to redeem the Series 4, 5, and 6 shares" on August 23, 2010 (*i.e.*, without first redeeming Plaintiffs' preferred Series N shares).[26]  Plaintiffs argue that both Citco and Fletcher then "attempted to cover their tracks" and that "Citco Trust,[27] as sole director of Global Hawk, consented to the transaction as of September 10, 2010."[28]  Plaintiffs assert that "Citco knowingly transferred the proceeds to RBS, payment to Richcourt, fees to Fletcher and fees to Citco in derogation to the superior rights of the Louisiana Funds, as holders of the preferred Series N Shares even though it secured the approval of these same individuals to allow the issuance of the Series N shares in March of 2008."[29]

By their Motion to Compel, Plaintiffs sought, *inter alia*, to compel production of certain "Group One" documents dated between June 16, 2010 and September 1, 2010.[30]  Plaintiffs argued

---

[24] R. Doc. 412-2, p. 3.  Plaintiffs argue that Leveraged had a $20 million outstanding loan to Citco Bank that was in default and that the loan was repaid using offering proceeds secured from the Louisiana Funds' purchase of the Series N shares.  R. Doc. 412-2, p. 4.

[25] R. Doc. 412-2, p. 5.

[26] R. Doc. 412-2, p. 3.  *See also*, R. Doc. 412-2, p. 5 ("By resolution dated April 1, 2010, Leveraged voted to redeem the Series 4, 5, and 6 shares to fund the RBS loan deficiency.").

[27] Citco Trust is not a party to these proceedings.

[28] R. Doc. 412-2, p. 4.  *See also*, R. Doc. 412-2, pp. 5-6 ("Citco insisted that the remaining $9.1 million come out of Leveraged to repay RBS.  The $9.1 million was obtained from Leveraged by the Richcourt Funds' redeeming the Series 4, 5, and 6 shares.  This amount was finally paid on August 23, 2010 after months of negotiation between Citco and Fletcher.  Ermanno Unternaehrer executed the August 23, 2010 settlement, which was the date the Funds were finally paid.  Citco Trust ("CTC Corporation") was also the sole director of Global Hawk and responsible for the closing of the transaction and paying the money to RBS.  As the sole director of Global Hawk, Citco continued to be involved in the Global Hawk wind down when it approved the transfer of the Series 4, 5, and 6 shares in exchange for shares in Arbitrage on September 8, 2010.").

[29] Motion to Compel (13-373), R. Doc. 412-2, p. 7.

[30] *See*, R. Doc. 412-2, p. 13.  Based on the original Motion to Compel, "Group One" document requests generally sought documents related to the financial condition and/or valuation of Leveraged, terms for the Series N shares,

that production of documents responsive to certain Requests for Production falling within Group One should be produced through an end date of September 1, 2010 based on their assertion that the Citco Defendants remained involved in the disbursement of the redemption of the Series 4, 5, and 6 shares. The Motion to Compel was discussed during a July 25, 2017 status conference with the parties.[31] During the status conference, counsel for the Citco Defendants explained that CFS Cayman resigned as administrator in March 2010 but continued to provide "transitional" services through June 15, 2010. Counsel for the Citco Defendants further explained that none of the Citco Defendants named in this case were involved in the unwinding of Global Hawk and Corsair.[32] In response, counsel for Plaintiffs argued that when Plaintiffs purchased the Series N shares, they understood that such shares ranked senior to the Series 4, 5, and 6 shares, and that emails produced indicate that the same individuals with Citco who were involved in obtaining approval for Plaintiffs' purchase of senior ranking shares were also involved in the redemption of non-Series N shares. Following the July 25, 2017 status conference, the undersigned issued a Ruling and Order denying Plaintiffs' Motion to Compel in part.[33] In denying Plaintiffs' request to compel production of additional Group One documents for June 16, 2010 through September 1, 2010, the court explained:

> Although the fact of the redemption of the non-Series N shares could be relevant to Plaintiffs' claims, based on the information presented, Plaintiffs have not established that additional information should be

---

redemption rights (for both Series N and non-Series N shares), agreements/communications between Citco and various entities/individuals (Fletcher, Corsair, Global Hawk, Leveraged, Arbitrage, FILB, Richcourt, Joe Meals, CSG), and the unwinding and termination of Global Hawk or Corsair Transactions. *See*, R. Doc. 412-2, pp. 13-15.

[31] On July 18, 2017, "in order to provide the parties an opportunity to discuss the pending motion at the status conference set for July 25, 2017," the court ordered that the Citco Defendants file an opposition to the Motion to Compel by July 24, 2017. R. Doc. 415.

[32] Citco asserted that the only Citco entities involved in the Corsair/Global Hawk transaction "were CTC Corporation Ltd., Citco Trustees (Cayman) Ltd., and CFS Amsterdam, none of which is a party to this action" and that "none of the Citco entities that are before this Court had anything to do with the unwinding." R. Doc. 417, p. 9.

[33] R. Doc. 426.

6

compelled particularly where no showing was made that any of the Citco Defendants were actually involved in the redemption of the Series 4, 5, and 6 shares or the unwinding of Corsair or Global Hawk. Accordingly, Plaintiffs' Motion to Compel production of Group One documents with the date range of June 16, 2010 through September 1, 2010 is DENIED.[34]

On August 7, 2017, Plaintiffs filed the instant Motion for Reconsideration.[35] Plaintiffs now seek an order requiring the Citco Defendants to produce Group One documents dated June 16, 2010 through September 1, 2010.[36] Plaintiffs' Motion is "made only on the limited issue of whether Citco should be required to produce documents after June 15, 2010 to September 1, 2010. (ECF 426, p. 10)."[37] The Motion for Reconsideration was discussed during the parties' October 24, 2017 status conference with the court. Following the parties' arguments, the court informed the parties that it would issue a written ruling on the Motion for Reconsideration.

In support of the Motion for Reconsideration, Plaintiffs rely on three exhibits. The first, "Exhibit 26" was filed in conjunction with the original Motion to Compel.[38] Exhibit 26 reflects emails between Citco employees related to the unwinding of the Global Hawk transaction through June 15, 2010 (*i.e.*, through the previous production cut-off date). Based on this exhibit, Plaintiffs have developed a list of individuals who "were involved on behalf of the Citco entities" in the unwinding of Global Hawk.[39] The second exhibit, referred to by Plaintiffs as "Exhibit 28,"[40] is

---

[34] R. Doc. 426, p. 10.

[35] R. Doc. 429.

[36] R. Doc. 429, p. 1.

[37] R. Doc. 429-2, p. 1. Plaintiffs define "Citco" as the defendants named in this suit, *i.e.*, The Citco Group Limited, Citco Technology Management, Inc., Citco Banking Corporation, N.V., and Citco Fund Services (Cayman Islands) Limited. R. Doc. 429-2, p. 1, n. 1.

[38] R. Doc. 416-22. In light of the fact that Exhibit 26 was filed with the original Motion to Compel, it is not an adequate basis for reconsideration.

[39] R. Doc. 429-2, pp. 3-4. Plaintiffs provide a chart of the following eight individuals: Ermanno Unternaehrer, Gabriele Magris, Albert Van Nijen, Gilbert Grosjean, Robert Thomas, Miklos Ujhelyi, Wiekert Weber, and Jonathan Roney.

[40] R. Doc. 442.

made up of two emails that, per Plaintiffs' briefing, "demonstrate that Steve Ali, a CFS Cayman employee, was making fee calculations in July, 2010. In addition, Miklos Ujhelyi, another CFS Cayman employee, was recalculating the NAV of Leveraged in August, 2010."[41] Plaintiffs contend that these emails show that CFS Cayman "continued to provide financial services, such as calculating the NAV of Leveraged in order to assist in the redemption of the Series 4, 5, and 6 shares and the unwind of Corsair and Leveraged."[42] The third exhibit, "Exhibit 29,"[43] is a fax from Fletcher Asset Management to a representative of Corsair (Tracey Barnes) dated July 26, 2010 referring to Grant Thornton's restatement of the 2007 and 2008 audits. Without further explanation, Plaintiffs contend that "[i]t is reasonable to expect that either Ms. Barnes or Fletcher also forwarded this information to Citco representatives."[44]

## II. Law and Analysis

### a. Standard for Reconsideration

While "the Rules do not formally recognize the existence of motions for reconsideration," "courts customarily consider such motions under either Rule 60(b) or Rule 59(e)." *Kiper v. Ascension Parish School Board*, Civil Action No. 14-313, 2016 WL 204480, at * 2 (M.D. La. Jan. 15, 2016). Generally, reconsideration is granted if one of four circumstances is shown: (1) the court is presented with newly discovered evidence; (2) the court has committed clear error; (3) the initial decision was manifestly unjust; or (4) a change in controlling law justifies an order's

---

[41] R. Doc. 429-2, p. 3.

[42] R. Doc. 429-2, p. 3.

[43] R. Doc. 442-1.

[44] R. Doc. 429-2, p. 5. The court finds Plaintiffs' assertion that it is reasonable to expect Exhibit 29 would have been forwarded to Citco representatives simply too speculative to form any potential basis for reconsideration. Moreover, the undersigned previously ordered the parties to work together to develop a limited number of custodians with respect to which the term "Grant Thornton" would be searched, R. Doc. 426, pp. 12-13, and Plaintiffs do not contest the Citco Defendants' assertion that the parties continue to confer regarding production of Grant Thornton documents. Accordingly, the undersigned analysis herein focuses on Exhibit 28.

modification. *Id*. A motion for reconsideration should not be used to raise arguments or evidence that could have been raised earlier. *Id*. at * 3. Plaintiffs characterize Exhibits 28 and 29 as "newly discovered" because, although produced prior to the filing of their original Motion to Compel and prior to the July 25, 2017 conference, Plaintiffs apparently had not reviewed them at that time.

### b. Procedural Issues

Plaintiffs explain that on June 30, 2017, the Citco Defendants produced approximately 70,000 pages of documents.[45] On July 11, 2017 Plaintiffs filed the original Motion to Compel. The Motion to Compel was considered during the July 25, 2017 status conference.[46] Plaintiffs assert that Citco's June 30, 2017 document production was made "just prior to the date of the hearing on the Motion to Compel" and that contained in the June 30th production (but not reviewed by Plaintiffs until after the July 25, 2017 conference) "were numerous examples of employees of Citco Financial Services, one of the defendants in this matter, continuing to provide services related to the redemption of the Series 4, 5, and 6 shares and the unwinding of Corsair and Global Hawk."[47] The Citco Defendants take issue with Plaintiffs' characterization of Exhibits 28 and 29 as "newly discovered" because it is uncontested that these documents were produced prior to the filing of Plaintiffs' Motion to Compel and prior to the July 25, 2017 conference. However, it is also uncontested that 70,000 pages of documents were produced to Plaintiffs on June 30, 2007, a little more than three weeks prior to the hearing.

---

[45] R. Doc. 429-2, p. 3 ("On June 30, 2017, only days prior to the hearing on the Motion to Compel, Citco produced approximately 70,000 pages of documents to the Louisiana Funds, which were in addition to the approximately 180,000 pages of documents that Citco had produced on a rolling basis from late March to late May, 2017.").

[46] As noted above, based on the court's order requiring the Citco Defendants' opposition to the Motion to Compel to be filed prior to the status conference, Plaintiffs were aware that the Motion to Compel would be considered during the status conference.

[47] R. Doc. 429-2, pp. 1-2. *See also*, R. Doc. 429-2, p. 3 ("On June 30, 2017, only days prior to the hearing on the Motion to Compel, Citco produced approximately 70,000 pages of documents….").

"[F]or purposes of Rules 59 and 60, 'newly discovered evidence' is a narrowly construed term, encompassing only data that could not have been unearthed and assembled prior to the ruling sought to be vacated." *Kiper*, 2016 WL 204480, at * 3 (considering what was within the plaintiff's reasonable grasp before the ruling). A motion for reconsideration "may not be used 'to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation.'" *Id.* (quoting *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000)). The undersigned recognizes that the evidence now relied upon by Plaintiffs was technically available to them prior to the July 25, 2017 conference; however, based on the volume of documents previously produced, as well as the volume of documents produced three weeks prior to the conference, the undersigned is hesitant to find that Plaintiffs could have reasonably unearthed Exhibit 28 prior to the July 25, 2017 conference and to deny Plaintiffs' Motion for Reconsideration on this procedural basis alone.

### c. Additional Production Should be Compelled

"Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). A determination of relevancy is tied to applicable substantive law and then weighed against the six proportionality factors. Any information sought that is not relevant to a party's claim or defense is not discoverable, regardless of proportionality. The court must additionally limit the frequency

or extent of discovery if it determines that: "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C).

As noted above, Plaintiffs argue that Exhibit 28 demonstrates that a CFS Cayman employee was making fee calculations in July 2010 and that another CFS Cayman employee was "recalculating the NAV of Leveraged in August, 2010."[48] Plaintiffs contend that the emails included in Exhibit 28 show that CFS Cayman "continued to provide financial services, such as calculating the NAV of Leveraged in order to assist in the redemption of the Series 4, 5, and 6 shares and the unwind of Corsair and Leveraged."[49] During the October 24, 2017 status conference, counsel for the Citco Defendants explained that Citco made revisions to the March 2010 NAV in August 2010, and that the Citco Defendants had already produced documents related to the NAV calculation.[50] Counsel for the Citco Defendants further argued that Plaintiffs were seeking to compel production of documents related to the unwinding of Corsair/Global Hawk, and that such documents are irrelevant to Plaintiffs' claims against the Citco Defendants. In response, counsel for Plaintiffs explained that CFS Cayman needed to complete a final NAV to be used in the unwinding of Global Hawk/Corsair and that the unwinding itself was in violation of Plaintiffs' rights to redeem their shares of Leveraged in preference to redemption of other shares.

---

[48] R. Doc. 429-2, p. 3.

[49] R. Doc. 429-2, p. 3.

[50] *See also*, R. Doc. 440, p. 5 ("CFS Cayman's contractual obligation to Leveraged ended on March 31, 2010, and it provided limited transitional services to Leveraged until June 15, 2010. (Laufer Decl. Ex. 2.) After June 15, however, CFS Cayman had no relationship with the Plaintiff Funds, and its involvement with Leveraged was limited to the finalization of the March 31, 2010 Net Asset Value statement.").

As noted by the court during the October 24, 2017 conference, Exhibit 28 indicates that the Citco Defendants continued to provide some sort of services in August 2010, including finalization of the NAV of Leveraged. The Citco Defendants argue that such services fall within the category of ministerial or transitional services and that, in any event, the Citco Defendants had no duty to provide Plaintiffs with any information after the Citco Defendants' involvement with Leveraged ended.[51] However, this court has not ruled on any dispositive motion setting forth the scope of the Citco Defendants' alleged duties (with respect to Plaintiffs' claims of negligent misrepresentation or otherwise), and given the uncontroverted assertion that the Citco Defendants were doing *something* during the June 16, 2010 through September 1, 2010 time period, the undersigned finds that Plaintiffs should be allowed to conduct discovery to determine the scope of what that "something" was. Although the Citco Defendants have repeatedly asserted that the Corsair/Global Hawk transaction bears no potential relevance to this case, based on Plaintiffs' assertions during the October 24, 2017 conference, it appears that recalculation or finalization of the NAV was an element required to move forward with the unwinding of Global Hawk/Corsair – the transaction which, as this court understands it, Plaintiffs allege resulted in the violation of Plaintiffs' priority redemption rights.

"For a motion to compel, '[t]he moving party bears the burden of showing that the materials and information sought are relevant to the action or will lead to the discovery of admissible evidence.'" *Mirror Worlds Technologies, LLC v. Apple Inc.*, Case No. 6:13-cv-419, 2016 WL 4265758, at *1 (E.D. Tex. Mar. 17, 2016) (quoting *SSL Servs., LLC v. Citrix Sys., Inc.*, No. 2-08-

---

[51] *See*, *e.g.*, R. Doc. 417, p. 6 ("documents dated after March 2010 are irrelevant because after that date any supposed fiduciary or contractual duties Citco could have owed to Plaintiffs while performing services for Leveraged necessarily ceased to exist after Citco stopped providing such services."); pp. 6-7 ("documents generated after March 2010—after Citco resigned as Leveraged's administrator—are also irrelevant because Citco could not have had any duty to disclose information to Plaintiffs after that time, and thus Plaintiffs could not have relied on any supposed omissions by Citco after that time.").

cv-158, 2010 WL 547478, at *2 (E.D. Tex. Feb. 10, 2010)). "Once the moving party establishes that the materials requested are within the scope of permissible discovery, the burden shifts to the party resisting discovery to show why the discovery is irrelevant, overly broad or unduly burdensome or oppressive, and thus should not be permitted." *Mirror Worlds Technologies, LLC*, 2016 WL 4265758 at *1. *See also*, *Wymore v. Nail*, No. 5:14-cv-3493, 2016 WL 1452437, at *1 (W.D. La. April 13, 2016) ("Once a party moving to compel discovery establishes that the materials and information it seeks are relevant or will lead to the discovery of admissible evidence, the burden rests upon the party resisting discovery to substantiate its objections.") (citing *McLeod, Alexander, Powel and Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990)). During the July 25, 2017 conference, the court explained that it was difficult to find the basis for the relevancy of documents beyond the June 15, 2010 date "which is when Citco was no longer serving in any capacity as administrator or in any transitional function…."[52] Based on what had been presented to the court at that time, the court further noted that while the "the fact of the unwind" could be relevant to Plaintiffs' claims, "any additional information about…Citco entities that aren't defendants in this case" was not.[53] As set forth herein, the undersigned finds that Plaintiffs have established that Group One requests for the time period of June 15, 2010 through September 1, 2010 are within the scope of permissible discovery because it appears that the Citco Defendants were performing some sort of services related to Leveraged after June 15, 2010. The Citco Defendants have not established that production of additional documents for this two and a half month period would be unduly burdensome or otherwise disproportionate to the needs of this

---

[52] *See*, R. Doc. 434, p. 80:16-17.

[53] R. Doc. 434, p. 80:17-22.

13

case.[54]  Accordingly, the court finds that Plaintiffs' Motion for Reconsideration should be granted, and that the Citco Defendants should be compelled to produce Group One documents with the date range of June 16, 2010 through September 1, 2010.

## IV. Conclusion

For the reasons set forth herein, Plaintiffs' Motion for Reconsideration[55] is **GRANTED**.

**IT IS HEREBY ORDERED** that the Citco Defendants shall produce "Group One" documents for the date range of June 16, 2010 through September 1, 2010 within thirty (30) days of this Ruling and Order.

Signed in Baton Rouge, Louisiana, on October 30, 2017.

*[signature: Erin Wilder-Doomes]*

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

---

[54] In opposition to the original Motion to Compel, the Citco Defendants asserted that compelling production of additional documents from the time period both before and after the Citco Defendants' alleged involvement with Leveraged would be disproportionate to the needs of this case. *See*, R. Doc. 417, p. 7 ("Plaintiffs contend that Citco should go back to the drawing board by collecting, reviewing, and producing documents generated between January 1, 2006 and March 31, 2011 – an additional *30 months* of documents."). During the July 25, 2017 conference, the Citco Defendants argued that because the Corsair/Global Hawk transaction was not relevant to Plaintiffs' remaining claims, further discovery regarding that transaction would be disproportionate to Plaintiffs' claims, especially since Plaintiffs already had information regarding the fact of the Corsair/Global Hawk transaction. This is not a showing as to disproportionality in light of the undersigned's ruling herein that the information sought may be relevant to Plaintiffs' claims in this matter.

[55] R. Doc. 429.