**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

FIREFIGHTERS' RETIREMENT
SYSTEM, ET AL.

VERSUS

CITCO GROUP LIMITED, ET AL.

CIVIL ACTION

13-373-SDD-EWD

**RULING ON: (1) MOTION TO COMPEL DEPOSITION RESPONSES FROM THE 30(B)(6) REPRESENTATIVE OF CITCO FUND SERVICES (CAYMAN ISLANDS) LIMITED, WIEKERT WEBER; AND (2) MOTION TO COMPEL DEPOSITION RESPONSES FROM THE 30(B)(6) REPRESENTATIVE OF THE CITCO GROUP LIMITED**

Before the court are two motions seeking to compel additional deposition testimony from certain of defendants' corporate representatives: (1) Motion to Compel Deposition Responses from the 30(b)(6) Representative of Citco Fund Services (Cayman Islands), Limited, Wiekert Weber (the "Motion to Compel CFS Deposition");[1] and (2) Motion to Compel Deposition Responses from the 30(b)(6) Representative of the Citco Group Limited (the "Motion to Compel Citco Group Deposition").[2] Both Motions were filed by plaintiffs, Firefighters' Retirement System ("FRS"), Municipal Employees' Retirement System of Louisiana ("MERS"), and New Orleans Firefighters' Pension & Relief Fund ("NOFF") (collectively, "Plaintiffs"). Defendants, Citco Technology Management, Inc. ("CTM"), Citco Banking Corporation N.V. ("Citco Banking"), Citco Fund Services (Cayman Islands) Limited ("CFS Cayman"), and The Citco Group Limited ("Citco Group") (collectively, the "Citco Defendants") have filed an Opposition to each Motion.[3]

For the reasons set forth herein, both Motions[4] are **DENIED**.

---

[1] R. Doc. 574.

[2] R. Doc. 584.

[3] R. Docs. 610 (opposition to Motion to Compel CFS Deposition) & R. Doc. 631 (Opposition to Motion to Compel Citco Group Deposition).

[4] R. Docs. 574 & 584.

1

**I.     Background**

On March 1, 2013, Plaintiffs filed this suit against 23 defendants, including the Citco Defendants, asserting claims under the Louisiana Securities Act and Louisiana Unfair Trade Practices Act, as well as third party beneficiary, unjust enrichment, breach of contract, negligent misrepresentation, and general tort claims.[5] Plaintiffs' claims arise from a $100 million investment loss. In April of 2008, the Louisiana Funds purchased 100,000 Series N Shares offered and issued by FIA Leveraged Fund ("Leveraged") for $100 million.[6] After a series of investment transactions initiated by Leveraged, in March of 2011, Plaintiffs sought to redeem their Series N shares.[7] Ultimately, the shares went unredeemed and Plaintiffs determined that the investment was illiquid and, thus, the N shares, for which there was no market, were valueless.[8]

Relevant to the instant Motions, Plaintiffs assert that "affiliates of CFS Cayman, all ultimately owned by Citco Group, received $50 million of the Offering Proceeds from the Series N Offering of Leveraged at the time CFS Cayman was serving as the administrator of the Leveraged Fund…."[9] Plaintiffs argue that they are entitled to obtain deposition testimony from representatives of CFS Cayman and Citco Group "to determine whether the Citco Group, Administrator, and the entities owned by the Citco Group (Citco Trading, Citco Trust, CFS

---

[5] R. Doc. 1-3.

[6] R. Doc. 1-3, ¶ 34.

[7] R. Doc. 1-3, ¶ 41.

[8] R. Doc. 1-3, ¶¶ 34-45 & 18. Leveraged was a feeder fund which Plaintiffs allege was formed primarily to invest in a master fund, Fletcher Income Arbitrage, Ltd. R. Doc. 1-3, ¶ 10.

[9] R. Doc. 574, p. 2. *See also*, R. Doc. 584-2, p. 1 ("the facts are uncontested that Citco Group and the entities wholly owned by the Citco Group received $50 million of the Offering Proceeds from the Series N Offering of Leveraged at the time Citco Fund Services (Cayman Islands) Limited ('CFS Cayman') was serving as administrator of the Leveraged Fund.").

Cayman, Citco Funds) breached its own internal policies in accepting these payments without disclosure to the Louisiana Funds."[10]

## II. Law and Analysis

Pursuant to Fed. R. Civ. P. 37(a)(3)(B)(i), a party seeking discovery may move to compel an answer where "a deponent fails to answer a question asked under Rule 30…." For purposes of this rule, "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond."[11]

### A. Plaintiffs' Motion to Compel CFS Deposition is Denied

Plaintiffs complain that Wiekert Weber ("Weber"), who was deposed individually and as the 30(b)(6) corporate representative of CFS Cayman, "failed to respond to questions asked about Citco's conflict of interest policy and whether it was in accordance with the policy for Citco affiliates to receive compensation from the proceeds of a fund's offering where CFS Cayman also serves as the independent administrator and not disclose the amount of funds Citco received to the purchaser of the securities."[12] Plaintiffs contend that Weber was "evasive and non-responsive" when asked questions regarding conflicts of interest[13] and that they are "entitled to receive a direct response from the 30(b)(6) corporate representative of CFS Cayman as to whether a conflict of

---

[10] R. Doc. 584-2, p. 2. *See also*, R. Doc. 574-2, p. 1 ("The conflict of interest policies and statements of the Administrator are important to this key issue, which will allow the Funds to determine whether the Administrator breached its own internal policies.").

[11] FRCP 37(a)(4).

[12] R. Doc. 574, p. 1.

[13] R. Doc. 574-2, p. 6.

interest existed…."[14]  Plaintiffs ask that the court require Weber to sit for an additional hour-long deposition at defendants' cost.[15]

Plaintiffs specifically complain that despite Mr. Weber's position as Compliance and Operations Manager of the Administrator, he refused "to respond to questions asked about the Administrator's conflict of interest policy and whether it violated the Administrator's policy for Citco affiliates to receive compensation from the proceeds…."[16]  In opposition to the Motion, the Citco Defendants contend that while Plaintiffs' deposition notice set forth topics related to CFS Cayman's conflict of interest *policies*, Plaintiffs' counsel never asked any questions regarding the policies themselves and instead asked confusing questions without laying the necessary foundation regarding hypothetical situations.[17]  The Citco Defendants further contend that despite the confusing questions, Weber "actually answered the very questions concerning conflict of interest Plaintiffs now falsely claim he 'refused' to answer or to which he supposedly provided nonresponsive answers."[18]

---

[14] R. Doc. 574-2, p. 10.

[15] During Mr. Weber's deposition, Plaintiffs' counsel attempted to communicate with the undersigned via telephone to discuss the responsiveness of Mr. Weber's testimony.  However, the undersigned was unavailable due to a settlement conference in another matter.

[16] R. Doc. 574-2, p. 2.

[17] In the deposition notice issued to CFS Cayman, the following topics specifically referenced "conflicts of interest:" "(5) Any policies and procedures relating to the disclosure of known conflicts of interest between any Citco entity and the investors in any fund for which CFS Cayman serves as administrator;" "(8) Any internal policies on written disclosure of conflicts of interest that may arise from agreements or other dealings between Citco and a fund or promoter of a fund, while CFS Cayman serves as administrator of said fund;" "(10) Any internal policies and procedures for reviewing the disbursements made by Leveraged from the proceeds of the Series N Offering to insure [sic] that the disclosure of any conflicts of interest arising from affiliates of CFS Cayman obtaining financial benefits from said proceeds which CFS Cayman served as administrator to Leveraged;" and "(33) CFS Cayman policies and procedures on reporting to investors on subscriptions, redemptions, NAV, conflicts of interest, and the financial results of operations of any fund for which CFS Cayman provides administrative services."  R. Doc. 590-1.  These topics clearly request information regarding CFS Cayman's conflict of interest policies and procedures.

[18] R. Doc. 610, p. 4.

The undersigned has reviewed the portions of Mr. Weber's deposition cited by the parties.[19] Based on that review, the court separates the questions posed to Mr. Weber into two categories. First, Plaintiffs' counsel asked Mr. Weber factual questions regarding CFS Cayman's duties as the administrator. Second, Plaintiffs' counsel asked Mr. Weber hypothetical questions seeking Mr. Weber's opinion as to whether a proposed set of assumptions would constitute a conflict of interest. With respect to the first category of questions, it does not appear that Plaintiffs' counsel attempted to clarify Mr. Weber's responses or otherwise explain to Mr. Weber that his responses were inadequate. With respect to the second category of questions, the court finds that such hypothetical questions were inappropriately directed to Mr. Weber in the first instance.

### i. Factual Questions

As noted above, certain questions posed to Mr. Weber during the deposition sought factual information regarding CFS Cayman's duties. The questions and responses which fall into this category and which Plaintiffs challenge are as follows:

> Q: And would you agree with me that an independent administrator would mean that you're independent of any conflicts? Isn't that correct?
>
> A: As fund administrator in our duty to perform the fund accounting, yes.
>
> Q: Would you agree with me that an independent administrator would have to disclose to investors any conflict of interest that he may have?
>
> A: I think that you pointed out yourself that [sic] offering memorandum mentions that the voting shares are held with Millennium (Cayman Islands) Foundation, which is an affiliate of the administrator. I think that is the disclosure you were referring to.

---

[19] Plaintiffs attach the unedited rough draft of Mr. Weber's deposition transcript to their Motion to Compel CFS Deposition. R. Doc. 575-1. The majority of the transcript cited by Plaintiffs is also attached to the Citco Defendants' opposition in edited form. R. Doc. 613.

5

> Q: Well, no. I mean, my question is a little more broader than that. Would you agree with me that an independent administrator would have to disclose to investors any conflicts of interest that it may have? Do you agree with that?
>
> A: No, to the extent that I already mentioned to you on the voting shares.
>
> Q: And why do you believe that an independent administrator would not have to disclose any conflicts of interest that it may have?
>
> A: Because it's not a conflict of interest.[20]
>
> \*\*\*
>
> Q: Do you know what a conflict of interest is?
>
> A: I – I have an idea what it is.
>
> Q: What would you say?
>
> A: So that we would, for example, provide investment advisory services and be the administrator to the Fund.
>
> Q: Or that you may be the administrator of the Funds and receive a substantial benefit from the offering proceeds; isn't that correct?
>
> A: I have no idea what you're –[21]

The undersigned considers the thrust of the above line of questions to be to explore Mr. Weber's understanding of what a conflict of is and what CFS Cayman's role as administrator of the Funds was. With regard to these questions, the undersigned does not consider certain of Mr. Weber's answers to be non-responsive. For example, Mr. Weber did provide a direct answer to the first question in the above exchange, and provided an example of what he understood a conflict of

---

[20] R. Doc. 613, pp. 188:5-189:11. At this point in the deposition, counsel for CFS Cayman interjected as follows: "I think you guys are two ships passing in the night. I think the witness is focused on an actual situation, and you are talking more hypothetically. So you might just want to rephrase the question because I think the previous back-and-forth did not reflect a mutual understanding between you two." R. Doc. 613, p. 189:13-21. Counsel for Plaintiffs then responded that he did not mind asking questions again. R. Doc. 613, p. 189:22-23.

[21] R. Doc. 613, pp. 189:25-190:12. The last exchange regarding receipt of "a substantial benefit" seems to veer into the second category of questions regarding whether a proposed scenario would constitute a conflict of interest. As discussed below, the undersigned finds such questions were inappropriately directed to Mr. Weber.

6

interest to be.[22] However, with regard to other questions in this exchange, the undersigned finds Mr. Weber's answers to be confusing and, at least based on the portion of the deposition transcript provided to the court, seemingly non-responsive.[23] Specifically, Mr. Weber's references to voting shares and his insistence that the issues regarding the voting shares were not a conflict of interest does not seem to directly answer Plaintiffs' counsel's questions. However, to the extent Plaintiffs' counsel believed Mr. Weber's responses to be inadequate, Plaintiffs' counsel had a responsibility to ask follow-up or clarifying questions. Especially in light of the parties' obligation to meet and confer regarding discovery disputes and the fact that the Citco Defendants' counsel attempted to explain that Plaintiffs' counsel and Mr. Weber did not seem to be talking about the same thing, the undersigned finds that Plaintiffs' counsel had an obligation, to the extent counsel believed Mr. Weber's responses to be confusing, non-responsive, or otherwise inadequate, to ask clarifying questions.[24] Rather than doing so, it appears that Plaintiffs' counsel moved on to what the court

---

[22] *Compare*, *Kasparov v. Ambit Texas, LLC*, No. 3:16-cv-3206, 2017 WL 4842350, at * 6-7 (N.D. Tex. Oct. 26, 2017) (noting that deponent "frequently did not provide a 'yes' or 'no' answer the first time that a question was asked even if it could have been so answered" and "often volunteered additional information and provided his own explanation as to the relevance or materiality of his answer" but ultimately finding that deponent "did not give evasive answers that amount to a failure to answer deposition questions at all….").

[23] The Citco Defendants assert in opposition to the Motion to Compel that Mr. Weber's answers to certain deposition questions were based on prior deposition testimony and specific discussion regarding aspects of the Offering Memorandum. *See*, R. Doc. 610, p. 7. The undersigned does not have enough information to make a determination regarding whether this is a fair characterization of Mr. Weber's responses.

[24] *See*, *e.g.*, *Kasparov*, 2017 WL 4842350, at * 6 (observing that "depositions have more flexibility than interrogatories because they permit an attorney to ask follow-up questions based on answers to previous questions or repeat questions if a deponent is being evasive."); *Offshore Marine Contractors, Inc. v. Palm Energy Offshore, LLC*, Civil Action No. 10-4151, 2013 WL 1412197, at * 4 (E.D. La. April 8, 2013) (finding attorney's objections made during deposition were not improper where such objections, although lengthy, sought to clarify opposing counsel's questions); *Sullivan v. Helmerich & Payne Intern. Drilling Co.*, Civil Action No. 07-08163, 2008 WL 3552582, at * 4 (E.D. La. Aug. 11, 2008) ("the attorneys acted in accordance with normal standards, as counsel often ask repeated questions during a deposition to parse out the facts of a case."). Further, to the extent Plaintiffs' counsel believed Mr. Weber's responses to be non-responsive, a "non-responsiveness objection" would preserve the ability to "seek a ruling on those objections, including requesting that the Court strike the non-responsive portion of the answers." *Kasparov*, 2017 WL 4842350, at * 7.

7

considers the second category of questions, those asking Mr. Weber to provide a conclusion as to whether a particular proposed scenario would constitute a conflict of interest.

### ii. Hypothetical Questions/Questions Regarding Whether There Is A Conflict of Interest

The remainder of the questions to which Plaintiffs assert Mr. Weber provided non-responsive answers fall within the second category of questions, *i.e.*, those seeking Mr. Weber's opinion as to whether a proposed set of assumptions would constitute a conflict of interest. The following exchanges fall within this second category:

> Q: Would the fact that you're receiving substantial compensation out of the offering and also serving as the administrator be a conflict of interest?
>
> A: I beg to differ because our fees, as in our administration agreement, are industry norm. There was nothing out of the ordinary….[25]
>
> ***
>
> Q: Would the fact that you're receiving substantial compensation other than fees out of the offering and also serving as administrator be a conflict of interest?
>
> A: No sir.
>
> [Counsel for Mr. Weber]: objection.
>
> A: I cannot – the fund administrator of Citco Fund Services Cayman Islands – and that's the company I'm representing – and as the administrator here where I am not even exposed to, I can only comment on that.
>
> Q: So I'm a little confused on the answer to your question. I asked the question, "Would the fact that you're receiving substantial compensation other than fees out of the offering and also serving as administrator be a conflict of interest?" And, I mean, the record I'm

---

[25] R. Doc. 613, p. 190:17-23.

reading, it say no, sir. Okay? Is there anything – I mean, is there any exception to that?[26]

***

Q: The question I'm asking, would the fact that you were receiving substantial compensation other than fees out of the offering and also serve [sic] as administrator be a conflict of interest?

[Counsel for Mr. Weber]: Objection to form. If you don't understand, then you need to say you don't understand.

A: Yeah. I don't understand. As I mentioned to you earlier, we have no conflict of interest. Citco Fund Service Cayman Islands have [sic] no conflict of interest.[27]

***

Q: I know you want to tell me they don't have a conflict of interest. Okay? What I'm telling you is, you got $50 million out of the offering. Okay? And let me ask the question as direct as I can. Is the fact that you got $50 million of the offering proceeds and you were also serving as administrator a conflict of interest?

A: I see –

[Counsel for Mr. Weber]: Objection to form. Lacks foundation.

A: Fletcher Asset Management went into a credit facility agreement with Citco Bank.[28]

Plaintiffs argue they "are entitled to receive a direct response from the 30(b)(6) corporate representative of CFS Cayman as to whether a conflict of interest existed when affiliates of the independent administrator received millions of dollar [sic] of benefits from the proceeds of the offering of an issuer of which CFS Cayman served as the independent administrator."[29] Although Plaintiffs cite to various documents that purport to prove that "affiliates of the Administrator

---

[26] R. Doc. 613, pp. 191:6-192:3.

[27] R. Doc. 613, p. 192:13-24.

[28] R. Doc. 613, p. 193:3-16.

[29] R. Doc. 574-2, p. 10.

9

received over $50 million dollars from the offering proceeds of the Series N Shares,"[30] Plaintiffs do not direct the court to any deposition testimony wherein Plaintiffs established this "fact" with Mr. Weber or that CFS Cayman, the entity which Mr. Weber represented, actually received these proceeds. Without the foundation that CFS Cayman received the proceeds this line of questioning amounts to asking Mr. Weber to assume a hypothetical situation.

A corporate representative is required to "testify about information known or reasonably available to the organization."[31] The Citco Defendants direct the court to numerous decisions wherein courts have refused to allow corporate representatives to provide opinion testimony based on hypothetical situations.[32] Although these cases are not binding on this court, the undersigned finds the reasoning set forth therein persuasive. While Plaintiffs may appropriately ask a 30(b)(6) representative questions regarding conflict of interest policies and procedures, questions that require the representative to determine whether Plaintiffs' purported "established facts" constitute a violation of such policies veer too far into the field of expert testimony and opinion. Moreover,

---

[30] R. Doc. 574-2, p. 2.

[31] Fed. R. Civ. P. 30(b)(6).

[32] *See*, *Byrd v. Wal-Mart Transp., LLC*, No. CB609-014, 2009 WL 3055303, at * 3 (S.D. Ga. Sept. 23, 2009) ("Hypothetical questions, in contrast, are never appropriate. Among other things, they invite virtually limitless deposition questioning best put to expert witnesses opining on matters like causation. Similarly, asking the 30(b)(6) deponent to assess another witness's testimony is impermissible; the witness is designated to depose on facts the corporation knows…."); *Silva v. San Pablo Police Department*, 16-cv-4360, 2018 WL 358789, at * 3 (N.D. Cal. Jan. 11, 2018) (noting that Plaintiffs admitted that they sought "an opinion on whether the actions taken by Defendant were in accordance with the City's customs, policies, or practices" and quashing the 30(b)(6) deposition because "[w]hile Plaintiffs may seek information on what the City's customs, policies, or practices are, Plaintiffs are going a step further by asking that the non-expert deponent opine as to the application of those policies and practices taken by the officers in this case." The court further explained that "[t]he proper course of action here would be for Plaintiffs to conduct discovery on the City's policies, practices, and customs, and then to depose an expert on whether the identified policies, practices, and customs were violated relative to the specific facts of this case."); *Boyer v. Reed Smith, LP*, No. C12-5815, 2013 WL 5724046, at * 4 (W.D. Wash. Oct. 21, 2013) ("Plaintiff is not permitted to request an expert opinion as to whether certain 'practices' complied with corporate 'policies.' The inquiry must be confined to matters 'known or reasonably available to the organization.'"). Although the Citco Defendants cite these cases in opposition to the Motion to Compel additional deposition testimony from Citco Group's corporate representative, the undersigned finds these cases equally applicable to the issue of whether the hypothetical questions directed to Mr. Weber were appropriate.

notwithstanding the fact that the questions may be hypothetical, these questions also call for a legal conclusion or go to the ultimate issue. "It is also generally prohibited for a lay witness to interpret statutes and to give legal opinions."[33] Courts in this Circuit have found that questions seeking legal conclusions are inappropriate.[34] Accordingly, the undersigned finds that such questions were improperly directed to Mr. Weber. Plaintiffs' Motion to Compel CFS Deposition[35] is DENIED.

### B. Plaintiffs' Motion to Compel Citco Group Deposition is Denied

Similar to Plaintiffs' complaints about Mr. Weber, Plaintiffs also assert that the 30(b)(6) representative of the Citco Group Limited, Ermanno Unternaehrer ("Unternaehrer"), failed to adequately respond to questions regarding conflicts of interest between any Citco entity and the investors. Plaintiffs seek to compel an additional one-hour deposition of Citco Group's 30(b)(6) representative (whether Unternaehrer or someone else) at Defendants' cost limited to "subject 26 of the Notice of Deposition."[36] Subject 26 of the Notice of Deposition is: "Any internal policies

---

[33] *U.S. v. El-Mezain*, 664 F.3d 467, 511-512 (5th Cir. 2011). (citing *U.S. v. Griffin*, 324 F.3d 330 (5th Cir. 2003); *United States v. Riddle*, 103 F.3d 423, 428 (5th Cir.1997) (holding that it was improper for a lay witness in a bank fraud prosecution to explain provisions of the banking regulations, to express his opinion on "prudent" banking practices, and to "draw on his specialized knowledge as a bank examiner" in giving his opinions about the defendant's actions.); *Huff v. United States*, 273 F.2d 56, 61 (5th Cir.1959) (where issue was whether jewelry was exempt from duty, a customs inspector was improperly allowed to testify about his own construction of the customs laws, rules, and regulations, and to opine that the jewelry found in defendant's possession was commercial in nature rather than a personal effect.).

[34] *United States ex rel. Rigsby v. State Farm Fire and Casualty Co.*, Civil No. 1:06 CV 433, 2013 WL 11322498, at * 1 (S.D. Miss. Feb. 25, 2013) ("The general rule is quite clear that witnesses, whether lay or expert, cannot testify as to legal conclusions."); *Gregory v. Baucum*, 7:16-cv-103, 2018 WL 684893, at * 4 (N.D. Tex. Feb. 2, 2018) ("Whether he is lay or expert, his conclusion that [defendants] did not demonstrate deliberate indifference is a legal conclusion that he is not permitted to offer, and thus the Court will not consider it."); *Newcourt, Inc. v. Landmark American Ins. Co.*, No. 5:10CV80, 2011 WL 13217847, at * 4 (E.D. Tex. May 20, 2011) (denying motion to quash portion of deposition notice because court was not convinced that the objected to topics "only call for legal conclusions" and explaining "[t]o the extent Plaintiffs ask Defendant's corporate representative(s) specific questions which arguably call for legal conclusions, Defendant may object to those specific questions during the deposition."); *Jenkins v. Rotobec, Inc.*, 1:09cv150, 2010 WL 11527364, at * 2 (S.D. Miss. July 6, 2010) (noting that questions requiring 30(b)(6) witness to draw legal conclusions were inappropriate).

[35] R. Doc. 574.

[36] R. Doc. 584.

11

and procedures relating to the disclosure of known conflicts of interest between any Citco entity and the investors in any fund that CFS Cayman serves as administrator."[37]

Plaintiffs assert that Mr. Unternauhrer served on the four-person executive committee of Citco Group from January 1, 2007 through December 31, 2008 and had specific knowledge regarding use of the offering proceeds and the negotiation of Fletcher's purchase of Richcourt from Citco Trading.[38] Despite this knowledge, Plaintiffs complain that counsel for Citco Group instructed Unternaehrer to not answer questions "about Citco's conflict of interest policy and whether it violated Citco's policy for Citco affiliates to receive compensation from the proceeds of an offering of an issuer of which CFS Cayman serves as the independent administrator and not disclose to the purchaser of the securities the amount of funds those Citco affiliates received."[39] Plaintiffs further complain that Unternauhrer took no steps to determine whether any conflict of interest policy existed for any Citco entity and that the Citco Defendants failed to move for a protective order prior to the 30(b)(6) deposition, thereby waiving any objections they had to Subject 26.[40] In opposition, the Citco Defendants assert that the parties reached an agreement

---

[37] R. Doc. 585-2. Plaintiffs' Motion to Compel also cites to "Subject 9" of the Notice of Deposition: "The uses of the Series N offering proceeds, including the following uses: payment to Citco Bank of the $13.5 million Leveraged loan; (ii) payment of $3 million for an outstanding Richcourt redemption request in Leveraged; or (iii) payment of $27 million to Fletcher which was used to acquire Richcourt from Citco Trading." R. Doc. 585-2. Based on Mr. Unternauhrer's deposition testimony, it appears he answered these questions, and Plaintiffs do not move to compel additional deposition testimony on topic 9.

[38] R. Doc. 584-2, p. 4 ("Mr. Unternaehrer had specific knowledge that the $13.5 million dollar loan was being repaid from the Offering Proceeds to Citco Bank and that $3 million of the Offering Proceeds was being used to pay a redemption request that was in default. Mr. Unternaehrer was responsible for negotiating Fletcher's purchase of Richcourt from Citco Trading that closed on or about June 20, 2008.") (internal citations to Unternaehrer's deposition omitted).

[39] R. Doc. 584-2, pp. 4-5.

[40] Plaintiffs also assert that "Citco's non-response" has prejudiced their experts' ability to complete their reports as well as Plaintiffs' ability to respond fully to contention interrogatories (which ask Plaintiffs to identify what they contend were the conflicts of interest). Plaintiffs do not provide any additional explanation, and the undersigned does not understand how Citco Defendant's determination of whether receipt of the offering proceeds was a conflict of interest in any way precludes Plaintiffs and their experts from finalizing their own opinions and contentions regarding those issues. This is particularly true in light of Plaintiffs' position that it is an established fact that "affiliates of the administrator received over $50 million dollars of the offering proceeds of the Series N Shares."

regarding the scope of Citco Group's deposition in accordance with the procedure set out by this court prior to the deposition, and that the parties agreed that Citco Group would not respond to questions regarding affiliates' knowledge. The Citco Defendants argue that Mr. Unternauhrer *did* answer questions regarding Citco Group's conflict of interest policies and procedures and that in any event Plaintiffs' questions regarding whether certain situations would violate such policies and procedures were impermissibly directed to Citco Group's corporate representative.

### i. The Court Previously Ordered the Parties to Utilize Written Objections and a Meet and Confer Process

As an initial matter, the undersigned finds Plaintiffs' argument regarding the Citco Defendants' failure to seek a protective order prior to Citco Group's corporate deposition unpersausive in light of the parties' agreements and representations during previous status conferences with the court.

During the February 8, 2018 status conference, counsel for Plaintiffs stated that Plaintiffs had issued formal notices for corporate depositions of the Citco Defendants pursuant to Federal Rule of Civil Procedure 30(b)(6), and counsel for the Citco Defendants stated that the Citco Defendants anticipated issuing formal objections to certain 30(b)(6) topic areas.[41] The Citco Defendants agreed to submit formal objections to the 30(b)(6) notices to Plaintiffs, and the court ordered the parties to confer regarding those objections.[42] The court further instructed the parties that issues regarding the scope of the corporate depositions of the Citco Defendants would be considered during the March 2018 status conference and ordered the parties to file status reports

---

[41] *See*, R. Doc. 532.

[42] *Id.*

including their positions regarding the scope of the 30(b)(6) depositions prior to the March conference.[43]

Although not attached to the Citco Defendants' opposition, the Citco Defendants assert that they provided the following formal objection to Subject 26:

> Citco Group objects to this Topic on the ground that the term 'conflicts of interest' is vague and ambiguous. Citco Group further objects to this Topic on the ground that it is overly broad and unduly burdensome and not proportional to the needs of the case. Citco Group further objects to this Topic on the ground that it seeks information regarding CFS Cayman's conflict of interest policies, if any, that can more conveniently and less burdensomely be obtained directly from CFS Cayman. Accordingly, Citco Group will not be producing a witness on this Topic, but is prepared to meet and confer with Plaintiffs.[44]

The Citco Defendants aver that following this formal objection, the parties met and conferred and that "Plaintiff raised no concerns at all about Citco Group's position on Topic 26…and in fact indicated they would direct specific questions about the conflict-of-interest policies and procedures of CFS Cayman to the CFS Cayman designee."[45] The Citco Defendants further assert that "Plaintiffs also represented that for *all* topics in the deposition notice, including Topic 26, Plaintiffs would ask questions relating to only *Citco Group* knowledge of the subject matter, not the knowledge of any of its affiliates and subsidiaries."[46]

---

[43] *Id*. During the February status conference, counsel for the Plaintiffs stated, with respect to the scope of the corporate depositions, that "it would advance the ball in a big way if the Court establishes a time frame to file the protective order…." R. Doc. 553, p. 11:7-8. In response, the undersigned then set a schedule for the parties to meet and confer following the Citco Defendants' submission of formal objections. The undersigned agreed to allow the parties to present any outstanding issues regarding the scope of the notices to the court via their March status reports. R. Doc. 552, pp. 13:4-25:3.

[44] R. Doc. 631, p. 7.

[45] R. Doc. 631, p. 7.

[46] R. Doc. 631, p. 7.

On March 1, 2018, Plaintiffs filed a Status Report which addressed, *inter alia,* the parties' meet and confer to discuss the scope of the 30(b)(6) depositions of "Citco Group Limited, CFS Cayman and CFS Cayman Investor Relations."[47] Therein, Plaintiffs represented that "[t]here was a detailed discussion between La. Funds' and Citco's counsel on which 30(b)(6) topics Citco would provide a responsive witness to and limitations to those responses that were agreed upon by the parties."[48] During the parties' March 6, 2018 status conference, counsel for Plaintiffs and counsel for the Citco Defendants confirmed that issues related to the scope of the 30(b)(6) depositions of Citco Group Limited, CFS Cayman, and CFS Cayman Investor Relations had been generally resolved, with the parties reserving rights to have objections that arose during the depositions resolved by the court.[49]

Based on the parties' representations and the previous instructions issued by this court during the status conferences, the undersigned will not penalize the Citco Defendants for failing to file a motion for protective order regarding Subject 26 prior to Citco Group's deposition. However, whether, as the Citco Defendants contend, Plaintiffs agreed to limit Citco Group's deposition to only Citco Group knowledge is a more difficult question for the court because the Citco Defendants do not present anything purporting to memorialize that specific agreement between the parties. Accordingly, the court considers the propriety of Subject 26 as originally noticed by Plaintiffs.

---

[47] R. Doc. 551, p. 1. Plaintiffs stated in the section of their Status Report titled "Scope of the 30(b)(6) of Citco Group Limited, CFS Cayman and CFS Cayman Investor Relations" that the parties met and conferred regarding the scope of corporate depositions of "Citco Technology Management, CFS Cayman as administrator of the funds, and CFS Cayman Investor Relations." R. Doc. 551. However, during the March 6, 2018 status conference, Plaintiffs' counsel confirmed that issues regarding the scope of the depositions of Citco Group Limited, CFS Cayman, and CFS Cayman Investor Relations had been resolved. *See*, R. Doc. 594, pp. 4:23-5:8.

[48] *Id*.

[49] *See*, R. Doc. 554.

### ii. Unternauhrer Adequately Responded to Plaintiffs' Counsel's Questions

During his deposition, Mr. Unternauhrer testified that neither Citco Group nor the executive committee had a conflicts of interest policy[50] and that he never reviewed any conflict of interest policy.[51] The disagreement regarding Mr. Unternauhrer's deposition comes down to (1) whether he should be required to testify as to subsidiary Citco entities (*i.e.*, while counsel for Citco Group allowed Unternauhrer to answer questions regarding Citco Group's conflict of interest policy, counsel instructed Unternauhrer not to answer questions regarding other Citco entities and maintained that such questions should be directed to the representatives of those entities);[52] (2) whether the corporate representative should be required to answer questions regarding whether certain factual scenarios presented by Plaintiffs would violate conflict of interest policies.

With respect to the first issue, the court finds Subject 26 as originally noticed overly broad and unduly burdensome and, therefore, not proportional to the needs of the case. The undersigned agrees that questions regarding an affiliate's conflict of interest policies and procedures are more appropriately directed to the affiliate in question. Significantly, the notice of deposition directed to CFS Cayman included the substantially similar following topic: "Any policies and procedures relating to the disclosure of known conflicts of interest between any Citco entity and the investors

---

[50] R. Doc. 585-1, p. 220:16-18 (affirming his testimony that executive committee had no conflict of interest policy); p. 226:14 ("There is no policy of Citco Group."); 226:21-25 ("Did Citco Group have policies restricting transactions resulting in financial benefits to affiliates of the administrators?" "Not to my knowledge."); 227:17-228:6 (testifying that, to his knowledge, there was no collection of records regarding conflicts that may exist among Citco entities and that no internal controls existed at Citco Group for dealing with conflicts of interest); 228:8-10 ("There is no policy dealing with conflict of interest at the Group level.").

[51] R. Doc. 585-1, p. 217:13-14 ("I have never seen a conflict of interests policy."); p. 218:21-23 ("And you never saw a conflict of interest policy on any Citco entity?" "No.").

[52] R. Doc. 585-1, p. 214:22-25 ("I am objecting to any questions related to topic number 26. That is what we put in our objections and told you to go to see [CFS] Cayman."); p. 222:5-8 ("He has already told you Citco Group does not have a conflict policy, so you talking about other Group entities. You should ask them."). *See also*, R. Doc. 585-1, pp. 220:25-221:5 ("I am going to object. He has already told you Citco Group does not have a conflict policy, so to the extent you are asking about other Group entities, we are instructing not to answer.").

in any fund for which CFS Cayman serves as administrator."[53] With respect to the second issue, and as explained above with respect to Mr. Weber, the court finds such questions were inappropriately directed to Mr. Unternauhrer in the first instance. Accordingly, Plaintiffs' Motion to Compel Citco Group[54] deposition is DENIED.

### C. The Citco Defendants' Request for Fees and Costs is Denied

Finally, in opposition to both Motions to Compel, the Citco Defendants ask the court to award them attorney fees and costs incurred in responding to the Motions.[55] Pursuant to Federal Rule of Civil Procedure 37(a)(5)(B), if a Motion to Compel is denied, the court "must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed the motion its reasonable expenses incurred in opposition the motion, including attorney's fees." However, the rule also provides that "the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(B). Here, although both Motions to Compel are denied, the undersigned declines to award fees and costs pursuant to Rule 37(a)(5)(B). Review of the portions of the deposition testimony indicates that while Plaintiffs' counsel's questions were at times confusing and lacking foundation, the deponents' responses were similarly opaque. With respect to Mr. Weber's deposition, it appears that Plaintiffs' counsel attempted to contact the undersigned to obtain guidance without the necessity of motion practice; however, the undersigned was unavailable due to an ongoing settlement conference in another matter. Further, with respect

---

[53] R. Doc. 631-1. A review of the corporate deposition testimony of CFS Cayman (at least the portion provided to the court) indicates that Plaintiffs did not ask Mr. Weber questions regarding the actual policies and procedures and instead, much like the majority of the questions directed to Mr. Unternauhrer about which Plaintiffs now complain, actually sought an opinion regarding whether a particular factual scenario would constitute a conflict of interest.

[54] R. Doc. 584.

[55] R. Doc. 610, pp. 12-13; R.Doc. 631, pp. 12-13.

17

to Mr. Unternauhrer's deposition, although the Citco Defendants argue that the parties reached an agreement regarding the scope of that deposition, that specific agreement was apparently not memorialized by the parties. Accordingly, the court DENIES the Citco Defendants' request for fees and costs.

### III. Conclusion

For the reasons set forth herein, **IT IS HEREBY ORDERED** that Plaintiffs' Motion to Compel Deposition Responses from the 30(b)(6) Representative of Citco Fund Services (Cayman Islands), Limited, Wiekert Weber[56] and Motion to Compel Deposition Responses from the 30(b)(6) Representative of the Citco Group Limited[57] are **DENIED**.

**IT IS FURTHER ORDERED** that the Citco Defendants' requests for fees and costs associated with opposing both Motions to Compel are **DENIED.**

Signed in Baton Rouge, Louisiana, on May 10, 2018.

*Erin Wilder-Doomes*
**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

---

[56] R. Doc. 574.

[57] R. Doc. 584.