# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

**FIREFIGHTERS' RETIREMENT
SYSTEM, ET AL.**

**VERSUS**

**CITCO GROUP LIMITED, ET AL.**

CIVIL ACTION

13-373-SDD-EWD

## RULING AND ORDER ON MOTION TO COMPEL

Before the court is a Motion to Compel Production of Documents Listed on Supplemental Privilege Log Pursuant to Court Order (ECF 513) (the "Motion to Compel")[1] filed by plaintiffs, Firefighters' Retirement System ("FRS"), Municipal Employees' Retirement System of Louisiana ("MERS"), and New Orleans Firefighters' Pension & Relief Fund ("NOFF") (collectively, "Plaintiffs"). Defendants, Citco Technology Management, Inc. ("CTM"), Citco Banking Corporation N.V. ("Citco Banking"), Citco Fund Services (Cayman Islands) Limited ("CFS Cayman"), and The Citco Group Limited ("Citco Group") (collectively, the "Citco Defendants") have filed an Opposition.[2] The Motion to Compel was discussed during the May 7, 2018 status conference. For the reasons set forth herein, Plaintiffs' Motion to Compel is **DENIED**.

**I.      Background**

On March 1, 2013, Plaintiffs filed suit against 23 defendants, including the Citco Defendants, asserting claims under the Louisiana Securities Act and Louisiana Unfair Trade Practices Act, as well as third party beneficiary, unjust enrichment, breach of contract, negligent misrepresentation and general tort claims.[3] Plaintiffs' claims arise from a $100 million investment loss. In April of 2008, the Louisiana Funds purchased 100,000 Series N Shares offered and issued

---

[1] R. Doc. 578.

[2] R. Doc. 627.

[3] R. Doc. 1-3.

by FIA Leveraged Fund ("Leveraged") for $100 million.[4] After a series of investment transactions initiated by Leveraged, in March of 2011, Plaintiffs sought to redeem their Series N shares.[5] Ultimately, the shares went unredeemed and Plaintiffs determined that the investment was illiquid and, thus, the N shares, for which there was no market, were valueless.[6]

By the instant Motion to Compel, Plaintiffs seek to compel production of: (1) 267 written communications between in-house lawyers for Citco Group, Citco Group's outside counsel (Linklaters), and UBS AG (the "UBS Documents");[7] and (2) 38 written communications between employees of Richcourt Fund Advisors S.A.S. ("Richcourt") and employees of Citco Group post-dating June 21, 2008 (the date Richcourt was purchased by Fletcher) (the "Richcourt Documents").[8] The Citco Defendants argue that the UBS Documents are protected under either English privilege law (which they contend applies) or Louisiana and federal common law attorney-client privilege (which this court has previously explained are materially similar) and that Plaintiffs fail to establish "at issue" waiver as to these documents. With respect to the Richcourt Documents,

---

[4] R. Doc. 1-3, ¶ 34.

[5] R. Doc. 1-3, ¶ 41.

[6] R. Doc. 1-3, ¶¶ 34-45 & 18. Leveraged was a feeder fund which Plaintiffs allege was formed primarily to invest in a master fund, Fletcher Income Arbitrage, Ltd. R. Doc. 1-3, ¶ 10.

[7] The UBS Documents are reflected on a privilege log attached to Plaintiffs' Motion to Compel. R. Doc. 578-5.

[8] The Richcourt Documents are reflected on a privilege log attached to Plaintiffs' Motion to Compel. R. Doc. 578-4. On January 5, 2018, in conjunction with a previous Motion to Compel, this court considered the sufficiency of the Citco Defendants' privilege log and noted that certain individuals included on the Citco Defendants' log appeared to be third parties, specifically, employees of UBS or Richcourt. R. Doc. 513, p. 14. The Citco Defendants were ordered to provide Plaintiffs with a supplemental log regarding these entries, as well as any legal authority or evidence establishing that inclusion of these individuals did not affect the existence of the attorney-client privilege. R. Doc 513, p. 22. On March 1, 2018, Plaintiffs filed a Status Report wherein they asserted, *inter alia*, that issues regarding the Citco Defendants' supplemental privilege log remained. R. Doc. 551, p. 3. On March 6, 2018, a status conference was held before the undersigned and Plaintiffs were granted leave to file a Motion to Compel regarding production of UBS Documents. R. Doc. 554. Although the court granted Plaintiffs leave only to file the Motion to Compel regarding the UBS Documents, a fair reading of Plaintiffs' Status Report indicates that Plaintiffs sought leave to file a Motion to Compel with respect to both UBS and post-June 23, 2008 Richcourt documents. Accordingly, the undersigned proceeds with considering both issues.

the Citco Defendants assert that withheld communications involve Richcourt employees who at the time of the communication worked for an affiliate of the Citco Defendants.[9]

## II. Law and Analysis

### A. UBS Documents

#### 1. The Richcourt Transaction & UBS Documents

In opposition to the portion of Plaintiff's Motion to Compel seeking production of the UBS Documents, the Citco Defendants explain that "[u]ntil 2008, Citco Group (through its wholly owned subsidiary Citco Trading) owned and operated the Richcourt group of companies."[10] The Citco Defendants attach the declaration of Mr. Nicholas James Braham, General Counsel for Citco Group, who states that he was "intimately involved in the Richcourt Transaction."[11] Mr. Braham explains that:

> In 2007, Citco Trading decided to sell Richcourt. To assist Citco Trading in selling Richcourt Holding, Citco Trading retained Linklaters LLP, a U.K. law firm, to provide legal advice on the sale of Richcourt. Citco Trading also retained UBS as its investment banker to, among other things, conduct the sale of Richcourt Holding and to provide Citco Trading and Citco Group with advice regarding that transaction. Specifically, UBS's role was to conduct an auction process for the sale of the Richcourt group of companies, assess the bids that were received by prospective purchasers and provide recommendations on those bids, and assist Citco Group's in-house and outside counsel in negotiating a purchase agreement with the ultimate purchaser.[12]

---

[9] R. Doc. 627, p. 24. In conjunction with their opposition, the Citco Defendants clarified the employment dates for Mr. Unternaehrer and Mr. Bloch and produced three of the documents listed on the Richcourt Documents privilege log for the time period during which Mr. Bloch was employed by Richcourt. *See*, R. Doc. 627, p. 25.

[10] R. Doc. 627, p. 5.

[11] R. Doc. 627-1, ¶ 3.

[12] R. Doc. 627-1, ¶ 5.

## 2. Choice of Law

The Citco Defendants assert in opposition to the Motion to Compel that English law applies to the issue of whether the UBS Documents are privileged. The Citco Defendants argue that "England is the *only* jurisdiction that has *any* relationship to the communications at issue here"[13] because the Linklaters attorneys, Citco Group in-house attorneys, and UBS employees who worked on the Richcourt transaction were all based in the United Kingdom, and point out that the UBS employees operated "under an engagement letter that contained a mandatory U.K. choice-of-law provision."[14] The Citco Defendants aver that "English law affords attorney-client protection to the entire 'continuum of communications' between an attorney and his client, even if those communications do not specifically contain legal advice or involve third parties."[15] The Citco Defendants further assert that "English law like Louisiana law, upholds the attorney-client privilege over communications between a client, his attorney, and a third-party representative."[16]

A threshold question before engaging in a choice-of-law analysis is to determine whether there is an actual conflict between Louisiana law and English law on the issue of attorney client privilege.[17] As the party moving to apply English law, the Citco Defendants have the "burden of

---

[13] R. Doc. 627, p. 10.

[14] R. Doc. 627, p. 10. Pursuant to a choice of law analysis under Louisiana Civil Code article 3515, the Citco Defendants also argue that the policies and needs of the interstate and international systems, including the justified expectations of the parties and minimizing adverse consequences of subjecting a party to the law of more than one state, dictate application of English law. R. Doc. 627, pp. 11-13.

[15] R. Doc. 627, pp. 13-14.

[16] R. Doc. 627, p. 14, n. 2.

[17] *See*, *QinetiQ Limited v. Samsung Telecommunications America L.P.*, No. 2:03-CV-221, 2004 WL 7330941, at * 2 (E.D. Tex. Aug. 12, 2004) ("A threshold question before engaging in a choice-of-law analysis is whether there is an actual conflict between domestic law and foreign law on waiver.") (citing *Teleplus, Inc. v. Avantel, S.A.*, No. SA 98-CA-849, 2003 WL 23282491, at *1 (W.D. Tex. April 9, 2003) ("[B]efore entering a conflict-of-law analysis, Defendant must prove that there is an actual conflict between the privilege law of the forum [Texas] and Mexican privilege law."); *Curley v. AMR, Corp.*, 153 F.3d 5, 12 (2nd Cir. 1998) ("[T]he first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws.")). *See also*, *Bilyeu v. Johanson Berenson LLP*, Civil Action No. 08-2006, 2010 WL 3896415, at * 5 (W.D. La. Sept. 30, 2010) ("If the laws

proving its substance to a reasonable certainty" such that this court may apply it to the documents at issue.[18] "Absent such proof, the district court should apply the law of the forum."[19] Here, the Citco Defendants provide a total of three cases from the United Kingdom.[20] The Citco Defendants assert that "[a]s long as the 'continuum of communications' is aimed at providing legal advice, the communications fall within the scope of the attorney-client privilege."[21] In support of that proposition, the Citco Defendants cite the following passage from *Balabel and Another v. Air India* [1988] Ch. 317:

> Privilege obviously attaches to a document conveying legal advice from solicitor to client and to a specific request from the client for such advice. But it does not follow that all other communications between them lack privilege. In most solicitor and client relationships, especially where a transaction involves protracted dealings, advice may be required or appropriate on matters great or small at various stages. There will be a continuum of communication and meetings between the solicitor and client….Where information is passed by the solicitor or client to the other as part of the continuum aimed at keeping both informed so

---

of two states are substantially similar such that they would yield the same resolution of a particular [issue] then there is no conflict and no need for a conflict of laws analysis.").

[18] *In re Avantel, S.A.*, 343 F.3d 311, 321 (5th Cir. 2003) (citing *Banque Libanaise Pour Le Commerce v. Khreich*, 915 F.2d 1000, 1006 (5th Cir.1990)).

[19] *Avantel*, 343 F.3d at 321-322. Federal Rule of Civil Procedure 44.1 provides that "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."

[20] The Citco Defendants do not provide any affidavits or other materials to establish what they contend should be controlling English law. *Compare*, *QinetiQ*, 2004 WL 7330941, at * 2 ("In support of its privilege assertions, QinetiQ submitted English case law and declarations from Charles Hollander, an English barrister and privilege law expert. In response, Samsung also submitted English case law and declarations from its own English law expert, Timothy James Dutton, advocating its interpretation of English privilege law."). *See also*, *Avantel*, 343 F.3d at 315 & 322 (affirming district court's determination that Avantel failed to prove Mexican law conflicted with Texas law on privilege issue and that Mexican attorney's declaration "failed to prove the Mexican doctrine adequately and conclusively" and explaining that "while [Mexican attorney] cited numerous Mexican codes to explain the professional secret doctrine, we agree with the district court's conclusion that he failed to address whether the documents in issue would be protected by the privilege, and never explains if or how the privilege applies to in-house counsel or to documents found in the possession of the client, such as e-mails in which an in-house attorney may only have received copies. Furthermore, the referenced foreign codes only address the rights of the lawyer—not those of the client—not to divulge certain information. Finally, the applicable codes to which Rendon refers in his declaration do not describe a doctrine either more or less protective than the privilege law in existence in Texas, but merely refer to a general privilege similar to that found in Texas.").

[21] R. Doc. 627, p. 14.

that advice may be sought and given as required, privilege will attach.[22]

The issue presented in *Balabel* was whether the "legal professional privilege" "extends only to communications seeking or conveying legal advice, or to all that passes between solicitor and client on matters within the ordinary business of the solicitor."[23] A review of the case indicates that the English Court of Appeal did not directly consider the effect of the presence of a third party on the privilege.[24] Further, while the Citco Defendants also cite *Buttes Gas and Oil Co. and Another v. Hammer and Another* [1981] Q.B. 223,[25] they contend that case upholds "like Louisiana law," "the attorney-client privilege over communications between a client, his attorney, and a third-party representative."[26] Based on the case law submitted by the Citco Defendants, the undersigned finds that the Citco Defendants have not carried their burden of proving "with a reasonable certainty the substance"[27] of English law with respect to the question of privilege over the UBS Documents. Moreover, in light of the Citco Defendants' assertion that "English law like Louisiana law, upholds the attorney-client privilege over communications between a client, his

---

[22] *See*, R. Doc. 627, p. 14.

[23] R. Doc. 627-2, *Balabel*, p. 321.

[24] The Citco Defendants also cite *Three Rivers District Council and others v. Governor and Company of the Bank of England (No. 6)* [2004] UKHL 48, 1 AC 610, 632 ("once the dominant purpose of the retainer is established as being the getting and giving of 'legal advice' the courts should be very reluctant to allow a division of the retainer into various sub-component purposes so as to say that some are not privileged."). This case likewise does not clearly establish what seems to be the Citco Defendants' major premise, *i.e.*, that communications with UBS as a third party would be within the asserted "continuum of communications" between the lawyer and client. *Compare*, *QinetiQ*, 2004 WL 7330941, at * 4 (explaining that under English law, "[d]ocuments emanating from or prepared by independent third parties and then passed on to the client's attorneys for the purpose of advice being given to the client are not privileged.") (citing *Three Rivers DC v. Bank of England (No. 7)*, 2003 EWCA 474, ¶ 1)).

[25] R. Doc. 627-2.

[26] R. Doc. 627, p. 14, n. 2. *But see*, *R. (on the application of Prudential plc) v. Special Commissioner of Income Tax*, [2013] UKSC 1, [2013] 2 W.L.R. 325 (S.C. 2013) (privilege only applies to lawyers; rejected claim that communications with accountant concerning tax matters were protected).

[27] *Ravenna Tankers Pte. SRL v. Omni Ships Pte. Ltd.*, Civil Action Nos. 13-127, 13-221, 2013 WL 2153544, at * 3 (E.D. La. May 15, 2013).

6

attorney, and a third-party representative,"[28] the undersigned is not convinced that a conflict of law actually exists here. Accordingly, the undersigned proceeds with the analysis of privilege over the UBS Documents pursuant to Louisiana/federal common law of attorney-client privilege.

### 3. UBS As A Representative of Citco Trading

"A party invoking the attorney-client privilege must establish: (1) that there was a communication between client and counsel; (2) the communication was intended to be confidential; (3) the communication was, in fact, kept confidential; and (4) the communication was made for the purpose of obtaining or providing legal advice."[29] "Under both Louisiana law and federal common law, which are materially similar, the attorney-client privilege protects confidential communications between the client or a representative of the client and the client's lawyer or a representative of the lawyer…."[30]

"The attorney-client privilege exists to protect confidential communications and to protect the attorney-client relationship and is waived by disclosure of confidential communications to third parties."[31] "However, the privileged nature of the communication depends on whether the third parties were 'representatives' of the client 'who [made] or receive[d] a confidential

---

[28] R. Doc. 627, p. 14, n. 2. Further, even if, as the Citco Defendants contend, English law more broadly protects the UBS Documents, in light of the undersigned's determination that the UBS Documents are protected by Louisiana attorney-client privilege law, there does not appear to be an actual conflict here.

[29] *Swoboda v. Manders*, Civil Action 14-19, 2016 WL 2930962, at * 4 (M.D. La. May 19, 2016) (citing *Bross v. Chevron USA, Inc.*, Civil Action No. 06-1523, 2009 WL 854446, at *3 (W.D. La. March 25, 2009) (citing *U.S. v. Construction Products Research, Inc.*, 73 F.3d 464, 473-74 (2d Cir. 1996)). In diversity actions such as this one, this court applies the state law of attorney client privilege. Fed. R. Evid. 501. Nonetheless, "federal common law and Louisiana statutory law are materially similar concerning the attorney-client privilege." *Akins v. Worley Catastrophe Response, LLC*, Civil Action No. 12-2401, 2013 WL 796095, at *11 (E.D. La. March 4, 2013); *see also Soriano v. Treasure Chest Casino, Inc.*, No. Civ. A 95-3945, 1996 WL 736962, at *2 (E.D. La. Dec. 23, 1996) (federal "common law and Louisiana statutory law are materially similar in this case in regards to attorney-client privilege").

[30] *Benson v. Rosenthal*, Civil Action No. 15-782, 2016 WL 1046126, at * 5 (E.D. La. March 16, 2016) (citing La. Code. Evid. art. 506(B)).

[31] *Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989). *See also*, *Benson*, 2016 WL 1046126, at * 5 ("When a communication between attorney and client occurs in the presence of a third party who is not the attorney's client, the communication generally is not confidential and the privilege is waived.") (citing *Nguyen v. Excel Corp.*, 197 F.3d 200, 207 (5th Cir. 1999); *Hodges, Grant & Kaufman v. United States*, 768 F.2d 719, 721 (5th Cir. 1985)).

7

communication for the purpose of effectuating legal representation for the client, while acting in the scope of employment for the client,' in which case no waiver of the privilege occurs."[32] "When agents or employees…participate as members of a team to provide information and documents to litigation counsel and to obtain from counsel answers to the client's questions, with the primary purpose of effectuating counsel's rendition of legal advice to the client, communications between the client's legal personnel and the third-party agents are privileged, and the privilege is not waived by the communications."[33]

A "representative of a client" is defined in Louisiana Code of Evidence, article 506, as "[a] person having authority to obtain professional legal services, or to act on advice so obtained, on behalf of the client" or "[a]ny other person who makes or receives a confidential communication for the purpose of effectuating legal representation for the client, while acting in the scope of employment for the client."[34] Here, the Citco Defendants have asserted various communications

---

[32] *Benson*, 2016 WL 1046126, at * 5 (citing La. Code Evid. art. 506(A)(2); *In re Liprie*, No. 10-21281, 2012 WL 4499062, at *2 (Bankr. W.D. La. Sept. 28, 2012) (citing *In re Bieter Co.*, 16 F.3d 929, 936 (8th Cir. 1994); 24 Wright & Miller §§ 5482, 5483 (1986)) (critical question under federal common law is whether "the presence of those representatives furthers the provision of legal services to the client")).

[33] *Id*. at * 6 (citing, *inter alia*, *In re Bieter*, 16 F.3d at 938; *In re Liprie*, 2012 WL 4499062, at *4; *Rodriguez v. CHRISTUS Spohn Health Sys.*, No. C-09-95, 2011 WL 3652189, at *7 (S.D. Tex. Aug. 18, 2011); *In re Vioxx Litig.*, MDL No. 1657, 501 F. Supp. 2d 789, 811 (E.D. La. Sept. 4, 2007); *In re Grand Jury Subpoenas*, No. M11-189, 265 F. Supp. 2d 321, 323, 329, 331 (S.D.N.Y. June 2, 2003); *In re Copper Mkt. Antitrust Litig.*, MDL 1303, 200 F.R.D. 213, 218-19 (S.D.N.Y. April 30, 2001); Paul R. Rice, Attorney-Client Privilege in the United States § 4:19 at pp. 4-68 to 4-71, 4-74 (1993)). *See also*, La. Code Evid. art. 506(A)(5)(a)-(c) (a communication is considered "confidential" if it is not intended to be disclosed to persons other than "[t]hose to whom disclosure is made in furtherance of obtaining or rendering professional legal services for the client;" "[t]hose reasonably necessary for the transmission of the communication;" and "[w]hen special circumstances warrant, those who are present at the behest of the client and are reasonably necessary to facilitate the communication.").

[34] La. Code Evid. art. 506(A)(2)(a)-(b). *See also*, *Kiln Underwriting Ltd. v. Jesuit High School of New Orleans*, Civil Action Nos. 06-04350, 06-05060, 06-05057, 2008 WL 108787, at * 4 (E.D. la. Jan. 9, 2008) (explaining that adjusting company would be a representative of plaintiff under Louisiana attorney-client privilege law "if [adjusting company] had the authority to procure professional legal services, or to act on advice so obtained on behalf of the client, or if it made or received a confidential communication for the purpose of effectuating legal representation for [plaintiff], while acting in the scope of employment for [plaintiff]."); *Hoerner v. Anco Insulations, Inc.*, Nos. 98-C-1398, 98-C-1598, 729 So. 2d 640, 644-45 (La. App. 4 Cir. 1999) (stating that "a representative of the lawyer is not merely one from whom the attorney requests information, but rather, involves a more direct and substantial relationship with the rendition of legal services" and explaining that "[t]here are few Louisiana cases that deal with persons employed by an attorney who are considered to be so interrelated with the rendition of legal services by the attorney that communications to them are considered as within the privilege. These cases tend to be fact specific rather than

between themselves, UBS employees, and Linklaters (Citco's counsel) are privileged because UBS was a representative of Citco "and had authority to obtain professional legal services and to act on advice so obtained on behalf of Citco."[35] The burden of establishing that these communications are subject to the attorney-client privilege lies with the Citco Defendants, the party asserting the privilege.[36]

In *U.S. v. Kovel*, 296 F.2d 918, 920 (2d Cir. 1961), the Second Circuit Court of Appeals considered "under what circumstances, if any, the attorney-client privilege may include a communication to a nonlawyer by the lawyer's client…." The *Kovel* court noted that "the complexities of modern existence prevent attorneys from effectively handling client's affairs without the help of others…" and analogized the use of a third party accountant to the use of a translator:

> This analogy of the client speaking a foreign language is by no means irrelevant to the appeal at hand. Accounting concepts are a foreign language to some lawyers in almost all cases, and to almost all lawyers in some cases. Hence the presence of an accountant, whether hired by the lawyer or by the client, while the client is relating a complicated tax story to the lawyer, ought not destroy the privilege, any more than would that of the linguist…the presence of the accountant is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit.

*Id.* at 921-922. The *Kovel* court further explained that "[w]hat is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer. If what is sought is not legal advice but only accounting service…or if the advice sought is the

---

establishing a general rule or standard. As in Subparagraph (A)(4), it is believed preferable to state in general terms that the privilege extends to those persons employed to assist counsel and to leave it to the courts to define the outer limits of inclusion.").

[35] *See*, R. Doc. 578-5 (Supplemental log entries including UBS employees).

[36] *Hodges, Grant & Kaufman v. U.S.*, 768 F.2d 719, 721 (5th Cir. 1985).

9

accountant's rather than the lawyer's, no privilege exists." *Id.* at 922. The Fifth Circuit has cited *Kovel* with approval in the context of a case applying the federal common law of attorney-client privilege,[37] and courts in this Circuit have relied on *Kovel* when determining whether communications with third parties are privileged.[38] Following these principles, other courts have found that communications with third-party financial advisors or investment bankers are protected by the attorney-client privilege where such communications were indispensable to the provision of the attorney's legal advice.[39]

---

[37] *U.S. v. El Paso Co.*, 682 F.2d 530, 541 (5th Cir. 1982) ("Because the privilege does not attach to tax work prepared by accountants unless the accountant is translating complex tax terms into a form intelligible to a lawyer at the lawyer's behest, *United States v. Kovel*, 296 F.2d at 922, the memoranda prepared by accountants do not qualify for the privilege."). *See also*, *In re Consolidated Litigation Concerning International Harvester's Disposition of Wisconsin Steel*, Nos. 81 C 7076, 82 C 6895, 85 C 3521, 666 F.Supp. 1148, 1156-1157 (N.D. Ill. July 17, 2987) ("Attorney-client communications disclosed to a third party for the purpose of assisting the attorney in rendering legal advice remain privileged, *see*, *e.g. United States v. Kovel*, 296 F.2d 918 (2d Cir.1961), but those disclosed for other purposes do not.").

[38] *Compare Ferko v. National Assoc. for Stock Car Auto Racing, Inc.*, No. 4:02-CV-50, 218 F.R.D. 125, 135 (E.D. Tex. Oct. 17, 2003) (explaining that an exception to the rule of third party waiver "exists for third parties who assist an attorney in rendering legal advice," noting that "[t]his circuit, like most, has adopted the *Kovel* test" and finding that communications between independent appraisal firm and auditors – both of whom were hired by in-house counsel in order for the attorney to better understand financial information for potential litigation with the SEC – were within the scope of attorney-client privilege) *with King v. University Healthcare System, LC*, Civil Action No. 08-1060, 2009 WL 10679780, at * 5 (E.D. La. Jan. 15, 2009) (finding plaintiff failed to meet her burden of establishing that communications between plaintiff, plaintiff's "business advisor" and plaintiff's attorney were privileged where business advisor had been advising plaintiff years prior to retention of plaintiff's attorney and plaintiff failed to show that disclosure to advisor was necessary for the purpose of obtaining or providing legal advice).

[39] *Crane Security Technologies v. Rolling Optics*, Civil Action No. 14-12428, 230 F.Supp.3d 10, 22-26 (D. Mass. Feb. 3, 2017) (where plaintiff engaged financial services firm "specifically" to assist in acquiring certain patents, and plaintiff's outside counsel communicated with financial services firm regarding the drafting and negotiation of the acquisition agreements, the court found the communications to be privileged because the communications were intended to remain confidential, review of the documents indicated that attorney asked financial services firm "for help crafting legal advice," and attorney averred in a declaration that legal advice was shared with financial services firm when "necessary to accomplish" the legal advice and that his practice was to collaborate confidentially with third-party financial advisors on significant corporate transactions); *In re Piedmont Office Realty Trust Inc. Securities Litigation*, Civil Action No. 1:07-cv-02660, 2011 WL 13169494, at * 2-4 (N.D. Ga. Oct. 27, 2011) (communications with investment bankers and other financial advisors privileged where a review of the documents at issue revealed that client's attorneys "relied upon the observations and experience of these third parties in evaluating the propriety, accuracy, and materiality of the disclosures [client] was to make in its public communications and SEC filings" and the communications "were sent for a predominately legal purpose and with an expectation of confidentiality."); *In re JP Morgan Chase & Co. Securities Litigation*, MDL No. 1783, 06 C 4674, 2007 WL 2363311, at * 7-8 (N.D. Ill. Aug. 13, 2007) (where client hired third-party to provide investment advisor services in connection with a merger, communications with third party investment advisor protected by attorney-client privilege); *Stafford Trading, Inc. v. Lovely*, No. 05-C-4868, 2007 WL 611252, at * 7 (N.D. Ill. Feb. 22, 2007) (where plaintiff and other Stafford-owned entities retained investment banker Goldman Sachs ("GS") to locate potential purchasers for Stafford and to assist in facilitating the transaction, and GS was "heavily involved" in negotiations between Stafford and a potential purchaser,

In support of their Motion to Compel, Plaintiffs primarily rely on the Second Circuit's decision in *U.S. v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999).[40] In *Ackert*, the Second Circuit explained that "*Kovel* held that the privilege can protect communications between a client and his accountant, or the accountant and the client's attorney, when the accountant's role is to clarify communications between attorney and client." The court considered whether communications between Paramount Corporation's in-house counsel and a representative of an investment banking firm (Goldman Sachs) were privileged. There, Goldman Sachs had approached Paramount with an investment proposal and Paramount's in-house counsel had subsequently communicated with David Ackert, a Goldman Sachs representative, to learn more details about the proposed transaction and its potential tax consequences so that he could advise Paramount. Years later, the IRS issued a summons to Ackert seeking his testimony about the investment proposal and Paramount asserted such communications were protected by the attorney-client privilege. The Second Circuit disagreed, explaining that while it assumed that Paramount's in-house counsel "interviewed Ackert in order to gain information and to better advise his client Paramount" that was "insufficient to give rise to the privilege."[41] The court explained that "the privilege protects communications between a client and an attorney, not communications that prove important to an attorney's legal advice to a client."[42] Because "Ackert's role was not as a translator or interpreter

---

privilege extended only to those documents (considered on a document by document basis) reflecting communications where "GS confidentially communicated with [client's outside counsel] or Stafford's in-house counsel for the purpose of obtaining or providing legal advice."); *Calvin Klein Trademark Trust v. Wachner*, No. 00 Civ. 4052, 124 F.Supp.2d 207 (S.D.N.Y. Dec. 20, 2000) (communications privileged notwithstanding the participation of investment bankers because investment bankers' role "involved rendering expert advice as to what a reasonable business person would consider 'material'" and "a responsible law firm…would not be able to adequately resolve [the question of materiality] without the benefit of an investment banker's expert assessment of which facts were 'material' from a business person's perspective.").

[40] *See*, R. Doc. 578-2, pp. 8-11.

[41] *Ackert*, 169 F.3d at 139.

[42] *Id*.

11

of client communications," the court found that "the principle of *Kovel*" did not, as a blanket proposition, shield those communications from disclosure.[43]

Plaintiffs contend that "*Ackert* has been interpreted by other district courts around the country to provide a very narrow and limited exception to expanding the attorney-client privilege to third party persons who are not clients."[44] As an initial matter, the undersigned finds *Ackert* itself, which dealt with an investment banker approaching a client with an unsolicited business deal rather than a client's specific retention of an investment banker to aid with a particular transaction, distinguishable.[45] Moreover, while the undersigned agrees that other courts, relying on *Ackert*, have found third-party communications with investment advisors to fall outside the scope of attorney-client privilege, the controlling factor in these cases is whether the third-party was necessary for the rendering of *legal* advice or was instead providing business advice.[46]

---

[43] *Id*. at 140 ("We do not preclude the possibility that, as the examination of Ackert proceeds, Paramount might demonstrate circumstances bringing some particular question or questions put to Ackert within the scope of Paramount's privilege. But we reject the magistrate judge's broad ruling that the entire examination of Ackert on his communications with Meyers is protected by Paramount's privilege.").

[44] R. Doc. 578-2, p. 9.

[45] *See*, *Crane Security*, 230 F.Supp.3d at 25 ("unlike in *Ackert*, where an investment banker approached a client with an unsolicited business deal, Crane specifically retained BBH to assist in a particular transaction. The information that BBH was providing cannot be said to have 'somehow come to' Crane's attorneys from a third party, *compare Ackert*, 169 F.3d at 140. BBH's participation was sought by the client, in part, to assist the attorney. It was more than merely 'important,' as according to Crane's attorney, BBH's advice was necessary, or required, for him to render advice to his client. Further, unlike in *Ackert*, where the IRS was investigating the parties, the court has found no evidence here that the claim of privilege is a 'subterfuge.'").

[46] *See*, *Louisiana Municipal Police Employees*, 253 F.R.D. at 312 (finding communications between defendant's counsel and defendant's investment banker were not privileged because banker "was not retained to facilitate the attorney-client relationship" based on retainer agreement which did not mention banker providing assistance to counsel in the provision of legal advice or banker providing information or materials to defendant's counsel and instead contemplated an evaluation of "another company and the structuring of the *financial* aspects of a transaction.") (emphasis in original); *Urban Box Office Network, Inc. v. Interfase Managers, LP*, No. 01 Civ. 8854, 2006 WL 1004472, at * 3-5 (S.D.N.Y. April 17, 2006) (finding communications with financial advisor, which had a written agreement with client "retaining it as its financial advisor to review its strategic plans and business alternatives, and to advise the company with respect to financing alternatives, joint ventures, and strategic alliances" were not privileged and explaining that "simply because financial consultants are employed to assist a company in a restructuring transaction does not mean that their communications with the company's attorneys are privileged. What is relevant is whether their communications with the attorneys were made in confidence for the purpose of the client obtaining legal advice from its counsel, *i.e.*, 'to help [the attorney] reach the understanding he needed to furnish legal advice.'") (citations omitted); *Export–Import Bank of the U.S. v. Asia Pulp & Paper Co., Ltd.*, No. 03 Civ. 232 F.R.D. 103, 112–14 (S.D.N.Y. Nov. 8, 2005) (attorney communications with financial advisor and consulting firm were not privileged

Per the engagement letter between Citco Trading and UBS,[47] UBS was to provide the following "financial advice and assistance" with respect to a potential sale transaction involving Richcourt and a third party:

> (a) In consultation with [Citco Trading], developing, updating and reviewing a list of potential purchasers and contacting potential purchasers;
>
> (b) In conjunction with [Citco Trading's] other professional advisors, preparation and circulation of sale documentation to potential purchasers;
>
> (c) Together with [Citco Trading's] other professional advisors, assisting in the negotiation of the terms of the Transaction for and on [Citco Trading's] behalf.[48]

The engagement letter provides that "[f]or the avoidance of doubt, the duties and responsibilities of UBS shall not include (a) giving tax, legal, regulatory, accountancy or other specialist or technical advice or services…" and that Citco Trading will rely on its own "expertise and that of specialist legal, accounting and tax advisors in respect to any due diligence exercise and in assessing the conclusions."[49] The Standard Terms and Conditions incorporated into the

---

where the advisor helped lead a company through a debt restructuring, negotiated on behalf of client, and helped formulate financial strategies, the advisor's role was not limited to helping the lawyer give effective advice by explaining financial concepts); *Stern v. United States*, CV-09-MC-06670, 2010 WL 7096092, at * 8 (D. Idaho, Aug. 16, 2010) ("if what is sought is not legal advice but only accounting service, or if the advice sought is the accountant's rather than the lawyer's, no privilege exists."); *Dahl v. Bain Capital Partners, LLC*, Civil Action No. 07-12388, 714 F.Supp.2d 225, 229 (D. Mass. June 22, 2010) (finding communications with financial advisor retained to manage the bidding process by which the company would be sold were not privileged and explaining that "JP Morgan's stated role with respect to these emails was to provide advice based on its 'financial expertise and industry experience,' which, by this characterization, is more within the realm of business advice rather than legal advice.").

[47] In support of the Motion to Compel, Plaintiffs submitted a draft engagement letter. R. Doc. 591. In their opposition to the Motion to Compel, the Citco Defendants do not assert that the draft is substantially incorrect or was later modified in any material way. *See*, R. Doc. 627, p. 16 (discussing the provisions of the engagement letter and concluding that "far from providing that attorneys for Citco Group may not 'rely upon the work of UBS,'…the UBS engagement letter actively provides for it.").

[48] R. Doc. 591, ¶ 1.

[49] R. Doc. 591, ¶ 1.

13

engagement letter provide that "Advice (including any opinion or report) whether written or oral by UBS to [Citco Trading], or any communications between UBS and [Citco Trading] in connection with the Engagement may only be used and relied upon by [Citco Trading] and may not be used or relied on by any third party and may not be disclosed to any third party without the prior written approval of UBS (other than [Citco Trading's] professional advisors who may place no reliance on such advice)."[50]

As evidence of the roles served by UBS, the Citco Defendants submit a Declaration from Citco Groups' General Counsel, Mr. Braham, wherein he asserts that Citco Trading retained Linklaters "to provide legal advice on the sale of Richcourt" and retained UBS "to, among other things, conduct the sale of Richcourt Holding and to provide Citco Trading and Citco Group with advice regarding that transaction."[51] Mr. Braham avers that UBS's role "was to conduct an auction process for the sale of the Richcourt group of companies, assess the bids that were received by prospective purchasers and provide recommendations on those bids, and assist Citco Group's in-house and outside counsel in negotiating a purchase agreement with the ultimate purchaser."[52] Mr. Braham further asserts that throughout the sales process, "attorneys at Linklaters (and Citco Group) regularly asked questions of and received input from UBS concerning, among other things, the structuring of the transaction, the impact of certain changes being proposed by the purchaser with respect to the draft transaction agreements, responses to queries received from several foreign regulatory authorities, and the coordination of the closing."[53] Mr. Braham asserts that "[t]hese communications with UBS were for the central purpose of assisting Linklaters in providing legal

---

[50] R. Doc. 591, Standard Terms and Conditions, ¶ 2(c).

[51] R. Doc. 627-1, ¶ 5.

[52] R. Doc. 627-1, ¶ 5.

[53] R. Doc. 627-1, ¶ 6.

advice concerning the Richcourt Transaction"[54] and that "[w]ithout UBS's participation and input, Citco Trading and Citco Group would not have been able to obtain fully informed legal advice from Linklaters regarding the negotiation of the legal terms of the Richcourt Transaction."[55]

Per the terms of the engagement letter and Mr. Braham's Declaration, UBS was retained by Citco Trading to provide various services. Some of these services – specifically with respect to developing and contacting potential purchasers, and preparing and circulating sales documentation – do not appear to be focused on providing services necessary for the rendering of legal, rather than business, advice. However, other services (*i.e.*, assisting in the negotiation of the terms of the transaction) may fairly be within the scope of that necessary for Linklaters to provide legal advice to Citco Trading. The Citco Defendants concede that certain communications with UBS do not fall within the scope of the privilege, and explain that they have "produced several thousand communications involving UBS where UBS was in fact providing routine business advice or was 'merely copied.'"[56] However, with respect to the withheld UBS Documents, the Citco Defendants assert that these "communications involve UBS working hand-in-hand with Linklaters and in-house counsel to provide legal advice to Citco Group."[57] The detailed descriptions set forth on the Citco Defendants' privilege log reflect that the withheld communications were primarily for the purpose of obtaining or rendering legal advice.

Pursuant to Local Civil Rule 26(c):

> A party withholding information claimed privileged or otherwise protected must submit a privilege log that contains at least the following information: **nam**e of the document, electronically stored information, or tangible things; **description** of the document,

---

[54] R. Doc. 627-1, ¶ 6.

[55] R. Doc. 627-1, ¶ 8.

[56] R. Doc. 614-2, p. 16.

[57] R. Doc. 614-2, p. 17.

15

> electronically stored information, or tangible thing, which description must **include each requisite element of the privilege or protection asserted**; **date**; **author**(s); **recipient**(s); and **nature of the privilege**.[58]

"[A] privilege log's description of each document and its contents must provide sufficient information to permit courts and other parties to 'test[ ] the merits of' the privilege claim."[59] "The standard for testing the adequacy of the privilege log is whether, as to each document, the entry sets forth facts that 'would suffice to establish each element of the privilege or immunity that is claimed.' The focus is on the specific descriptive portion of the log, and 'not on conclusory invocations of the privilege or work-product rule, since the burden of the party withholding documents cannot be discharged by mere conclusory' assertions."[60] "Objections based on the attorney client privilege or work product doctrine "can only be sustained if they are both properly asserted and the facts supporting the privileges are established by the evidence, not merely declared by lawyer argument."[61] "The party claiming the privilege must 'describe those documents to the best of its ability without revealing the information privileged.'"[62]

Here, the privilege log setting out withheld UBS Documents contains descriptions that meet the Citco Defendants' burden of establishing that UBS was involved in these communications with the primary purpose of obtaining or facilitating the rendition of legal advice. The descriptions of the communications include "email discussing intent to request legal advice from counsel (N.

---

[58] Emphasis added.

[59] *Equal Employment Opportunity v. BDO USA, LLP*, 876 F.3d 690, 697 (5th Cir. 2017) (internal citations omitted).

[60] *Chemtech Royalty Associates, L.P. v. U.S.*, Civil Action Nos. 05-944, 06-258, 07-405, 2009 WL 854358, at * 3 (M.D. La. March 30, 2009) (internal citations omitted). *See also*, *U.S. v. Louisiana*, Civil Action No. 11-470, 2015 WL 2453719, at * 1 (M.D. La. May 22, 2015) (same).

[61] *U.S. v. Louisiana*, 2015 WL 2453719, at * 2 (citing *Estate of Manship v. U.S.*, Civil Action No. 04-91, 232 F.R.D. 552, 561 (M.D. La. Dec. 8, 2005).

[62] *Id.*

Braham) re: Project Rainier draft disclosure agreement for UBS,"[63] "email chain from counsel reflecting legal advice re: summary of key legal terms in Richcourt bids,"[64] "email from counsel reflecting legal advice re: draft share purchase agreement for Richcourt sale,"[65] "email chain with counsel providing legal advice and requesting information in order to provide legal advice re: non-compete provisions in Project Rainier share purchase agreement,"[66] and "email chain with counsel reflecting and requesting legal advice re: Project Rainier financial regulatory issues."[67] Plaintiffs do not point to any particular entry on the privilege log describing withheld UBS Documents which they assert is deficient. Instead, Plaintiffs contend that none of the documents withheld can possibly be within the scope of the attorney-client privilege. As set forth above, under Louisiana law, the attorney-client privilege can include communications by and with a "representative of a client." The attorney-client privilege is not destroyed by communications by and through a representative of the client regarding the obtaining or rendering of legal advice, especially where, as here, the Citco Defendants have provided evidence via Mr. Braham's declaration to establish that the reliance on such representative was necessary for the client's attorneys to provide competent legal advice.[68] Accordingly, Plaintiffs' Motion to Compel production of the UBS Documents is DENIED.

---

[63] R. Doc. 578-5, # 6. Mr. Braham explains in his Declaration that "Project Rainier" was the "internal code name for the Richcourt sale." R. Doc. 627-1, ¶ 5.

[64] R. Doc. 578-5, # 20.

[65] R. Doc. 578-5, # 42.

[66] R. Doc. 578-5, # 105.

[67] R. Doc. 578-5, # 1737.

[68] *See, e.g., Crane Security*, n. 39, *supra*. Because the privilege log sets forth the privilege in adequate detail, the burden shifts to the Plaintiffs to establish that the privilege should not apply. In addition to asserting that the documents are not protected by the attorney-client privilege, Plaintiffs also assert that the Citco Defendants have waived any privilege over the documents based on the Citco Defendants' assertions that they relied on UBS to determine the source of the funds used by Fletcher to buy Richcourt. *See*, R. Doc. 578-2, pp. 12-13. "The Fifth Circuit has stated that '[t]he attorney-client privilege 'was intended as a shield, not a sword. When confidential communications are made a material issue in a judicial proceeding, fairness demands treating the defense as a waiver of the privilege.'" *Apex Municipal Fund v. N-Group Securities*, Civ. A. No. H-92-0546, 841 F.Supp. 1423, 1431 (S.D.

### B. Richcourt Documents

Plaintiffs "concede" that "all documents including Richcourt, Linklaters, and Citco sent prior to June 20, 2008 are privileged because Citco controlled and employed Richcourt employees."[69] However, Plaintiffs argue that "Yves Bloch and Ermanno Unternaehrer were employees and managers of the new Richcourt entity owned by Fletcher, as such, any communication with them would not be privileged after June 21, 2008."[70] In opposition to this portion of the Motion to Compel, the Citco Defendants aver that "[c]ontrary to Plaintiffs' assertion, Mr. Unternaehrer remained an employee of Citco Group after June 20, 2008, and was not an employee or manager of any 'new Richcourt entity owned by Fletcher.'"[71] Because Mr. Unternaehrer remained an employee of Citco Group, the Citco Defendants assert that his presence on the Richcourt Documents "does not break the attorney-client privilege."[72] In contrast, the Citco Defendants state that "Mr. Bloch *did* transfer to Richcourt after the sale closed on June 20, 2008, *but only* until June 15, 2009, when he returned to an affiliate of the Citco Defendants."[73] In support

---

Tex. Oct. 28, 1993) (citing *Conkling v. Turner*, 883 F.2d 431, 434 (5th Cir.1989)). "[T]he attorney-client privilege is waived when a litigant 'places information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party.'" *Conkling*, 883 F.2d at 434. *See also*, *WIII Uptown, LLC v. B&P Restaurant Group, LLC*, 15-mc-51, 2016 WL 4620200, at * 12 (M.D. La. Sept. 6, 2016) ("[w]aiver occurs only when the privilege-holder will be forced inevitably to draw upon a privileged communication at trial in order to prevail.") (internal citations omitted). In opposition to Plaintiffs' waiver argument, the Citco Defendants assert that they do not rely on any privileged documents or communication in support of their defenses and that "[m]ore than seven months ago, we represented to the Plaintiffs in writing that 'none of the withheld [Richcourt Transaction] documents relate' to the 'source of proceeds of Fletcher to acquire Richcourt." R. Doc. 627, p. 24. Accordingly, notwithstanding whether the source of the funds has been placed at issue by the Citco Defendants, it appears that the withheld documents are not relevant to the source of the funds in the first instance.

[69] R. Doc. 578-2, p. 1, n. 1.

[70] R. Doc. 578-2, p. 14.

[71] R. Doc. 627, p. 25.

[72] R. Doc. 627, p. 25.

[73] R. Doc. 627, p. 25. The Citco Defendants recognize that Mr. Bloch's inclusion on the Richcourt Documents "breaks the attorney-client privilege only in that narrow time period" and state that the documents within this timeframe (June 20, 2008 through June 15, 2009) were produced to Plaintiffs on April 13, 2018 (*i.e.*, the date the Citco Defendants submitted their opposition to the Motion to Compel). R. Doc. 627, p. 25.

18

of the asserted employment dates, the Citco Defendants provide portions of Mr. Unternauhrer's and Mr. Bloch's depositions.[74] Plaintiffs do not point to any evidence to contradict these employment dates. In light of Plaintiffs' concession that communications involving Mr. Unternaehrer and Mr. Bloch are privileged for the time periods during which these individuals were employed by Citco entities, and the Citco Defendants' representations that any documents outside these time periods have been produced, the undersigned DENIES Plaintiffs Motion to Compel production of the Richcourt Documents.

### III. Conclusion

For the reasons set forth herein, the Motion to Compel Production of Documents Listed on Supplemental Privilege Log Pursuant to Court Order (ECF 513) (the "Motion to Compel")[75] filed by plaintiffs, Firefighters' Retirement System ("FRS"), Municipal Employees' Retirement System of Louisiana ("MERS"), and New Orleans Firefighters' Pension & Relief Fund ("NOFF") is **DENIED**.

Signed in Baton Rouge, Louisiana, on May 21, 2018.

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

---

[74] R. Doc. 639, Mr. Unternaehrer Deposition, p. 40:12-18 (A: "I had an employment agreement with Citco Group Limited from 2005 until recently." Q: And even though you worked for Richcourt you had the employment agreement with Citco Group Limited, is that correct?" A: "Correct. That was not my only function as Citco."); p. 41:3-4 ("I don't think I was ever employed by a Richcourt company."); R. Doc. 639, Mr. Bloch Deposition, pp. 32:15-25 (Q: "Did you continue as an officer of Richcourt after Mr. Fletcher acquired the company in June 2008?" *** A: "Yes, I was still the financial officer of the structure, but I was not director of the company anymore."); p. 33:2-8 (Q: "But you were still the CFO of Richcourt after Mr. Fletcher acquired the company?" A: "Yes." Q: "And how long did you continue to serve in your capacity as CFO of Richcourt after Mr. Fletcher acquired the company?" A: "Until June 2009.").

[75] R. Doc. 578.